IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

MAYOR AND CITY COUNCIL OF BALTIMORE,
Plaintiff-Appellee,
v.

ALEX M. AZAR II, in his official capacity as Secretary of the United
States Department of Health and Human Services, et al.,
Defendants-Appellants.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

**PETITION FOR INITIAL HEARING EN BANC**

Suzanne Sangree
*Senior Counsel for Public Safety &*
  *Director of Affirmative Litigation*
CITY OF BALTIMORE
DEPARTMENT OF LAW
City Hall, Room 109
100 N. Holliday Street
Baltimore, MD 21202
443-388-2190
suzanne.sangree2@baltimorecity.gov

Stephanie Toti
LAWYERING PROJECT
25 Broadway, Fl. 9
New York, NY 10004
646-490-1083
stoti@lawyeringproject.org

Andrew T. Tutt
Drew A. Harker
ARNOLD & PORTER KAYE
SCHOLER LLP
601 Massachusetts Ave., NW
Washington, DC 20001
(202) 942-5000
andrew.tutt@arnoldporter.com

Priscilla J. Smith
REPRODUCTIVE RIGHTS &
JUSTICE PROJECT AT
YALE LAW SCHOOL
319 Sterling Place
Brooklyn, NY 11238
priscilla.smith@ylsclinics.org

*Counsel for Appellee Mayor and City Council of Baltimore*
(additional counsel listed on following page)

Faren M. Tang
REPRODUCTIVE RIGHTS &
JUSTICE PROJECT AT
YALE LAW SCHOOL
127 Wall Street
New Haven, CT 06511
faren.tang@ylsclinics.org

*Counsel for Appellee Mayor and City Council of Baltimore*

# RULE 35(b) STATEMENT

The Appellee Mayor and City Council of Baltimore ("Appellee") respectfully requests that the full court hear this Appeal to determine whether the district court correctly vacated and set aside the HHS final rule entitled *Compliance with Statutory Program Integrity Requirements*, 84 Fed. Reg. 7714 (Mar. 4, 2019), *codified at* 42 C.F.R. Part 59, because the Rule is arbitrary and capricious. 5 U.S.C. § 706.

This case warrants initial hearing en banc because it involves a question of national importance. The Rule has caused at least half a dozen states, and more than a thousand Title X clinics, to stop using Title X funds or to withdraw from the program altogether, threatening access to reproductive health care for as many as 1.6 million low-income women nationwide. The question whether the Rule is arbitrary and capricious sharply divided a Ninth Circuit en banc panel that heard another case challenging the Rule pursuant to an initial hearing en banc. *California v. Azar (California)*, 2020 WL 878528 (9th Cir. Feb. 24, 2020) (en banc).

# TABLE OF CONTENTS

**Page**

PETITION FOR INITIAL HEARING EN BANC ...................................1

I.    FACTUAL BACKGROUND..............................................................3

II.   THE RULE IS ARBITRARY AND CAPRICIOUS ......................11

    A.    HHS's Conclusion that the Rule is Consistent with
        Medical Ethics Is Unsupported by the Record and
        Inadequately Explained........................................................12

    B.    The Record Contradicts HHS's Repeated Statements in
        the Rule That There Was "No Evidence" That the Rule
        Would Have an Adverse Impact on Patients or Providers...14

    C.    No Evidence Supports HHS's Estimate of the Costs of the
        Separation Requirement, and the Overwhelming Weight
        of the Evidence Shows That HHS Vastly Underestimated
        Its Costs................................................................................16

III.  THE NINTH CIRCUIT ERRED IN HOLDING THAT THE
     RULE IS NOT ARBITRARY AND CAPRICIOUS ......................17

CONCLUSION ......................................................................................19

CERTIFICATE OF COMPLIANCE......................................................22

ADDENDUM

    *Mayor & City Council of Baltimore v. Azar*,
        No. CV RDB-19-1103, 2020 WL 758145 (D. Md. 2020)

# TABLE OF AUTHORITIES

**Cases:**                                                        **Page(s):**

*California v. Azar (California),*
   2020 WL 878528 (9th Cir. Feb. 24, 2020) .................... 1, 11, 17, 18, 19

*Casa De Maryland v. DHS,*
   924 F.3d 684 (4th Cir. 2019) ............................................................ 12

*Gresham v. Azar,*
   No. 19-5094, 2020 WL 741278 (D.C. Cir. Feb. 14, 2020) .................. 13

*Hobby Lobby Stores, Inc. v. Sebelius,*
   723 F.3d 1114 (10th Cir. 2013) ............................................................ 1

*Mayor & City Council of Baltimore v. Azar,*
   No. CV RDB-19-1103, 2020 WL 758145
   (D. Md. Feb. 14, 2020) ............................................................. *passim*

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut.*
   *Auto. Ins.*, 463 U.S. 29, 43 (1983) ...................................................... 12

*West Virginia v. EPA,*
   No. 15-1363 (D.C. Cir. May 16, 2016) ................................................. 1

**Statutes**

5 U.S.C. § 706 ................................................................................... 11

42 U.S.C. § 300a-4 .............................................................................. 3

42 U.S.C. § 300a-6 .............................................................................. 3

Public Health Service Act, Pub. L. No. 91-572, tit. X,
   84 Stat. 1506 (1970) ......................................................................... 3

**Rules**

Compliance With Statutory Program Integrity
   Requirements, 83 Fed. Reg. 25,502 (June 1, 2018) ............................. 4

Compliance With Statutory Program Integrity
Requirements, 84 Fed. Reg. 7714 (Mar. 4, 2019) ...................... *passim*

Grants for Family Planning Services, 36 Fed. Reg. 18,465,
18,466 (Sept. 15, 1971), *codified at* 42 C.F.R. § 59.5(9)
(1972) ................................................................................... 4

Standards of Compliance for Abortion-Related Services in
Family Planning Services Projects, 65 Fed. Reg. 41270
(July 3, 2000), *codified at* 42 C.F.R. Part 59 (2000) ........................... 4

## Comments

HHS-OS-2018-0008-102966, American Academy of Family
Physicians, https://bit.ly/2SEl2VQ (July 25, 2018) ........................... 6

HHS-OS-2018-0008-106624, American Academy of Nursing,
http://bit.ly/2VS2Hpi (July 26, 2018) .................................. 6

HHS-OS-2018-0008-179339, American College of
Obstetricians and Gynecologists, http://bit.ly/2ZjlEDt
(July 31, 2018) ................................................................. 6

HHS-OS-2018-0008-179739, American Medical Association,
http://bit.ly/2Zexyyi (July 31, 2018) .................................. 6

HHS-OS-2018-0008-181588, American Academy of
Pediatrics (AAP), https://bit.ly/32OLd0I (July 31, 2018) .................... 6

HHS-OS-2018-0008-184400, American College of Physicians,
https://bit.ly/2Yd6jCs (July 31, 2018) .................................. 6

## Other Authorities

Guttmacher Institute, *Domestic Gag Rule Has Slashed the
Title X Network's Capacity by Half* (Feb. 5, 2020),
http://bit.ly/3csjZle ........................................................ 9, 10

## PETITION FOR INITIAL HEARING EN BANC

This case warrants initial hearing en banc in light of its exceptional national importance. Initial hearing by the en banc court is authorized by rule and statute. *See* Fed. R. App. P. 35(a) (providing that a case may be "heard or reheard by the court of appeals en banc"); 28 U.S.C. § 46(c) (similar); *see also Meadows v. Holland*, 831 F.2d 493, 494 (4th Cir. 1987) (initial hearing en banc), *vacated on other grounds,* 489 U.S. 1049 (1989). This Court granted initial hearing en banc in a case of similar national importance almost exactly three years ago. *Int'l Refugee Assistance Project v. Trump*, 857 F.3d 554 (4th Cir. 2017) (en banc).

To be sure, initial hearing en banc is not common, but this court has invoked its initial en banc authority when appropriate, *see, e.g.*, *Meadows,* 831 F.2d at 494 (initial hearing en banc), and courts of appeals have repeatedly chosen to proceed in this manner in cases raising important questions regarding the lawfulness of nationwide executive action, *see, e.g.*, *California v. Azar (California)*, 2020 WL 878528 (9th Cir. Feb. 24, 2020) (en banc) (lawfulness of the Title X family planning Rule at issue in this case); *West Virginia v. EPA*, No. 15-1363 (D.C. Cir. May 16, 2016) (en banc) (challenge to "Clean Power Plan"); *Hobby Lobby*

*Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1125 (10th Cir. 2013) (en banc) (challenge to contraceptive mandate), *aff'd sub nom. Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682 (2014).

There can be little doubt that the issue presented by this case meets the standard for initial en banc consideration. This case raises an urgent question of real-world import for the Mayor and City Council of Baltimore ("Baltimore City") and for millions of low-income patients who rely on Title X for access to quality family planning care. This case is also exceptionally important because of the fundamental principle at stake: whether the Administrative Procedure Act's basic requirement of reasoned decisionmaking and reasoned explanation still applies even when the issue considered by an agency is politically charged and controversial.

Although Defendants view the issue in this case through a different lens, they too find the question presented exceptionally important. Defendants have sought emergency relief and expedited briefing at every stage of this litigation in light of what Defendants see as the exceptional importance of HHS's regulatory goals. The plan to seek a stay of the district court's final judgment in favor of Appellee on that very basis in

this very appeal. Initial hearing en banc is thus consistent with all parties' views of the gravity of the case. Moreover, initial en banc hearing may promote a swifter resolution of this appeal in comparison to en banc review after a panel disposition. Plaintiff therefore respectfully submits that initial hearing en banc is appropriate.

## I. FACTUAL BACKGROUND

### A. The Pre-2019 Title X Program

For almost fifty years, the Title X program has provided free or reduced-cost family planning care to needy patients across the country. *See* Pub. L. No. 91-572, 84 Stat. 1504 (1970). The program has been governed by largely unchanged rules, and it has been one of this country's most successful public health programs: reducing rates of abortion and unintended pregnancy by facilitating contraceptive access; providing testing and treatment for sexually transmitted infections; screening for breast and cervical cancer; and conducting pregnancy testing and counseling. Section 1008 of Title X provides that no Title X funds "shall be used in programs where abortion is a method of family planning," 42 U.S.C. § 300a-6, and indeed, no funds ever have.

Title X gives the Secretary authority to promulgate grant-making regulations, 42 U.S.C. § 300a-4(a). In 1971, the Department issued its first regulations implementing Title X. It required each grantee of Title X funds to provide assurances that, among other things, priority will be given to low-income individuals, services will be provided "solely on a voluntary basis" and "in such a manner as to protect the dignity of the individual," and the "project will not provide abortions as a method of family planning." 36 Fed. Reg. 18,465, 18,466 (Sept. 15, 1971), *codified at* 42 C.F.R. § 59.5(9) (1972). Each program was to provide "medical services related to family planning including physician's consultation, examination, prescription, continuing supervision, laboratory examination, contraceptive supplies, and necessary referral to other medical facilities when medically indicated" and include "[p]rovision for the effective usage of contraceptive devices and practices." These policies and interpretations "have been used by the program for virtually its entire history." 65 Fed. Reg. 41270, 41271 (July 3, 2000).

## B. The 2019 Rule

On June 1, 2018, HHS issued a proposed rule that would overhaul the longstanding Title X regulations in numerous respects. 83 Fed. Reg.

25,502 (Jun. 1, 2018) (the "Proposed Rule"). HHS received over 500,000 public comments opposing the Proposed Rule—including extensive comments from major medical associations, major Title X providers and policy and research organizations, nearly 200 members of Congress, and several states.

Among other things, the Proposed Rule included provisions that severely limited, and in many circumstances barred, Title X recipients from providing their patients with referral and counseling for abortion services, and mandated referrals for prenatal care for women who became pregnant. The Proposed Rule also included provisions requiring strict physical separation between Title X services and any healthcare services that did not comply with the new restrictions on abortion referrals, counseling, and services. The Proposed Rule also barred anyone at a Title X project but physicians from engaging in Nondirective Counseling.

The nation's leading non-partisan medical associations, counting more than 90 percent of the nation's OB-GYNs among their members, submitted comments opposing the changes contemplated by the Proposed Rule. The groups included the American Medical Association ("AMA"),

http://bit.ly/2Zexyyi, the American College of Obstetricians and Gynecologists ("ACOG"), http://bit.ly/2ZjlEDt, the American College of Physicians ("ACP"), https://bit.ly/2Yd6jCs, the American Academy of Family Physicians ("AAFP"), https://bit.ly/2SEl2VQ, the American Academy of Nursing ("AAN"), http://bit.ly/2VS2Hpi, and the American Academy of Pediatrics ("AAP"), https://bit.ly/32OLd0I.

On March 4, 2019, HHS published the final Rule entitled *Compliance With Statutory Program Integrity Requirements*, 84 Fed. Reg. 7714 (Mar. 4, 2019) (to be codified at 42 C.F.R. pt. 59) ("Rule"). The Rule's referral restrictions and separation requirements were unchanged. Most of the Rule's provisions, including its limitations on referrals, were scheduled to go into effect on May 3, 2019, 84 Fed. Reg. at 7714. Compliance with the separation requirement is required by March 4, 2020. *Id.* at 7714.

### 1. The Counseling Restrictions

The Final Rule imposes broad restrictions on what health care providers under the Title X program may inform pregnant patients. The Rule states that "[a] Title X project may not perform, promote, refer for, or support abortion as a method of family planning, nor take any other

affirmative action to assist a patient to secure such an abortion." 84 Fed. Reg. 7,788 (to be codified at 42 C.F.R. §§ 59.5(a)(5), 59.14(a) (abortion-referral ban)). The Rule states that to meet this requirement Title X grantees may not provide any information about abortion providers, identified as such, to a patient.

Providers may not offer a patient an abortion referral except in an emergency. If a patient specifically asks for a referral for pregnancy termination during pregnancy counseling, providers are prohibited from offering the patient anything more than a list of "comprehensive primary health care providers"—most of whom must *not* provide any abortions. *Id.* at 7789. The list cannot identify which providers actually provide the abortion services she is requesting, and staff are prohibited from answering patient questions about which providers on the list actually provide abortions. *Id.* Because the list is limited to "comprehensive primary health care providers," specialized reproductive healthcare providers are excluded.

Even as Title X providers are prohibited from referring for pregnancy termination (even if the patient asks for it) providers are required to refer all pregnant patients for prenatal care (even if the

patient has expressly stated she does not want such a referral). 84 Fed. Reg. 7789 (to be codified at 42 C.F.R. §§ 59.14(b)(1)).

## 2. The Separation Requirement

The Rule requires that Title X activities be "physically and financially separate" (defined as having an "objective integrity and independence") from prohibited activities. These "activities" include not just the provision of abortion services, but also any counseling that does not meet the counseling restrictions. 84 Fed. Reg. at 7789. Whether this criterion is met is to be determined through a "review of facts and circumstances," with relevant factors including but not limited to:

> (a) The existence of separate, accurate accounting records; (b) The degree of separation from facilities (e.g., treatment, consultation, examination and waiting rooms, office entrances and exits, shared phone numbers, email addresses, educational services, and websites) in which prohibited activities occur and the extent of such prohibited activities; (c) The existence of separate personnel, electronic or paper-based health care records, and workstations; and (d) The extent to which signs and other forms of identification of the Title X project are present, and signs and material referencing or promoting abortion are absent.

*Id.* The preamble notes that physical separation at a "free-standing clinic," like one of the Baltimore City clinics, "might require more circumstances to be taken into account in order to satisfy a clear

separation between Title X services" and abortion referrals, because having the "same entrances, waiting rooms, signage, examination rooms, and the close proximity between Title X and impermissible services" presents "greater opportunities for confusion" than at a hospital. *Id.* at 7767. The Rule does not specify which additional circumstances would be taken into account.

## C. Proceedings Below

Before the Rule took effect Baltimore City, alongside over twenty states and some of the Nation's leading medical organizations, including the American Medical Association and the National Family Planning & Reproductive Health Association, brought lawsuits in federal district courts across the country to vacate the Rule. Two courts in the Ninth Circuit preliminarily enjoined the Rule nationwide, one preliminarily enjoined the Rule in California, and the Court below preliminarily enjoined the Rule in Maryland. All of those preliminary injunctions were stayed by panels of the Ninth Circuit and this Court, respectively, and the Rule took effect.

The impact of the stays was "huge." Guttmacher Institute, *Domestic Gag Rule Has Slashed the Title X Network's Capacity by Half* (Feb. 5,

2020), http://bit.ly/3csjZle. "[O]ne in every four Title X service sites left the network in 2019 because of the domestic gag rule." *Id.* Planned Parenthood withdrew from the Program, as did numerous States. Unable to comply with the Rule's requirements, Maryland withdrew from Title X, forcing Baltimore City out of the program as well. The stay forced Baltimore City to relinquish hundreds of thousands of dollars in Title X funds. For the first time in the 50 year history of the Title X program, Baltimore City is not a part of the program. Baltimore City intends to reenter the program immediately once it is clear that compliance with the Rule is no longer a condition to receiving funds.

During the pendency of the stay, Baltimore City litigated this case to judgment. On February 14, 2020, the court below granted each of the parties' motions for summary judgment in part and ordered the Rule vacated and permanently enjoined in the State of Maryland. The Court's key holding is as follows:

> Having carefully reviewed the Administrative Record in this case, this Court is compelled to find that HHS's promulgation of the Final Rule was arbitrary and capricious for three key reasons. First, HHS has inadequately explained its decision to "disagree" with comments by every major medical organization regarding the Final Rule's contravention of medical ethics. Second, HHS inadequately considered the "reliance interests" that would be disrupted by its change in

policy. Finally, HHS inadequately considered the likely costs
and benefits of the physical separation requirement.

*Mayor & City Council of Baltimore v. Azar*, No. CV RDB-19-1103, 2020
WL 758145, at *8 (D. Md. Feb. 14, 2020) ("Op."). The court held that
HHS's conclusory rejection of medical ethics concerns was "plainly
arbitrary and capricious," Op.*10, that "HHS entirely ignored the
evidence that raised concerns about the Final Rule's reducing access to
Title X services nationwide," Op.*10, and that HHS's "conclusory
response to commenters' evidence backed concerns about the serious
problems the physical separation requirement [would] cause [flew] in the
face of established APA principles," Op.*11.

Ten days later, on February 24, the Ninth Circuit sitting en banc to
review the three preliminary injunctions issued in that Circuit decided
to reach the merits of the Plaintiffs' arbitrary and capricious claims
(without reviewing the administrative record), and held that the Rule is
not arbitrary and capricious. *California*, 2020 WL 878528, at *21-26.

## II.    THE RULE IS ARBITRARY AND CAPRICIOUS

The Administrative Procedure Act ("APA") requires courts to "hold
unlawful and set aside agency action, findings, and conclusions found to
be arbitrary, capricious, an abuse of discretion, or otherwise not in

accordance with law." 5 U.S.C. § 706. In reviewing a rule, courts "must engage in a searching and careful inquiry of the [administrative] record, so that we may consider whether the agency considered the relevant factors and whether a clear error of judgment was made." *Casa De Maryland v. DHS*, 924 F.3d 684, 703 (4th Cir. 2019). An agency rulemaking is arbitrary and capricious if, in coming to its decision, the agency "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.* (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43 (1983)).

A. **HHS's Conclusion that the Rule is Consistent with Medical Ethics Is Unsupported by the Record and Inadequately Explained**

HHS's conclusion in the Rule—that HHS "disagrees" that the Rule infringes on the legal, ethical, and professional obligations of medical professionals, Op.*9—is arbitrary and capricious because it is contrary to the evidence before the agency and inadequately explained. *See* 84

Fed. Reg. at 7724, 7748; Op.*1-*2. HHS has not identified any code of medical ethics under which the Rule's counseling restrictions would be considered ethical. Op.*8-*9. Nor has HHS identified any professional medical organization that takes the position that it is ethical to withhold relevant medical information from a patient who is requesting it. Op.*8-*9. HHS has not identified a single physician who believes it is consistent with medical ethics for a physician to obstruct a patient's access to safe and legal medical treatment because the physician disagrees with the patient's decision to pursue that treatment. Op.*8-*9. HHS's explanation for its conclusion was inadequate. Op.*10. "Nodding to concerns raised by commenters only to dismiss them in a conclusory manner is not a hallmark of reasoned decisionmaking." *Gresham v. Azar*, No. 19-5094, 2020 WL 741278, at *7 (D.C. Cir. Feb. 14, 2020) (Sentelle, J.).

HHS's conclusion that the Rule is consistent with medical ethics, *see* 84 Fed. Reg. at 7724, 7748, is contrary to the evidence before the agency. Op.*8-*9. Major medical organizations including the AMA, ACOG, AAFP, ACP, AAP, AAN, and numerous additional organizations and individuals, all told HHS that the Rule would violate medical ethics and place physicians in an ethically compromised situation. Op.*8-*9.

Four States and Planned Parenthood told HHS that the professional and ethical violations would be so profound they would be forced to exit the program if the proposed regulations were finalized (which they later did). Op.*8-*9. In fact, several commenters explained that providers would have to withdraw, and as a result, beneficiaries would have significantly reduced access to care. Op.*8-*9. HHS cited no evidence of any kind showing that any organization or even any individual physicians consider the Rule consistent with medical ethics, and there does not appear to be any evidence in the record that would support that conclusion. Op.*8-*9.

## B. The Record Contradicts HHS's Repeated Statements in the Rule That There Was "No Evidence" That the Rule Would Have an Adverse Impact on Patients or Providers

HHS stated in the Rule that "[t]he Department finds <u>no evidence</u> to support the assertion that the final rule will drive current providers from the Title X program." 84 Fed. Reg. at 7749 (emphasis added). It stated: "<u>commenters did not provide evidence</u> that the rule will negatively impact the quality or accessibility of Title X services. And the Department believes that this rule will likely improve quality and accessibility for Title X services." *Id.* at 7780 (emphasis added). It stated: "[c]ommenters offer <u>no compelling evidence</u> that this rule will increase

unintended pregnancies or decrease access to contraception." *Id.* at 7785 (emphasis added). It stated that it was "<u>not aware, either from its own sources or from commenters, of actual data</u> that could demonstrate a causal connection between the type of changes to Title X regulations contemplated in this rulemaking and an increase in unintended pregnancies, births, or costs associated with either." *Id.* at 7775 (emphasis added). In reliance on this mistaken belief that it lacked any evidence, HHS asserted that "these final rules will contribute to more clients being served, gaps in service being closed, and improved client care." *Id.* at 7723.

HHS's statements that "no evidence" supported the view that the Rule would have any impacts on providers or patients in the Title X program are contrary to the evidence the agency had before it. Op.*10. Numerous existing Title X providers explained that they would have to withdraw from Title X if the Rule took effect. Op.*10. That was certainly *some* evidence "supporting the assertion that the final rule [would] drive current providers from the Title X program," 84 Fed. Reg. at 7749—making the agency's claim that there was "no evidence supporting the assertion" wrong. Commenters also provided HHS with evidence that—

by causing a widespread withdrawal of providers from the Title X program—the Rule would limit access to contraception and other types of reproductive health care, harming women's health. Op.*10. HHS failed to account for these effects because it "[did] not anticipate that there will be a decrease in the overall number of facilities offering services" and that "the net impact on those seeking services from current grantees will be *zero*." 84 Fed. Reg. 7782 (emphasis added).

## C. No Evidence Supports HHS's Estimate of the Costs of the Separation Requirement, and the Overwhelming Weight of the Evidence Shows That HHS Vastly Underestimated Its Costs

HHS estimated that affected grantees would incur average costs of $30,000, but provided no support for that estimate. 84 Fed. Reg. 7782. HHS has not identified any evidence in the record that supports this $30,000 number—not one study, not one pilot program, not one expert opinion, not even one comment from the public. Op.*11. The evidence before the agency instead showed that this unfounded number is nowhere close to the actual cost of compliance: Planned Parenthood estimated average capital costs of nearly $625,000 per affected service site. Op.*11. Other commenters pointed to costs of a similar magnitude. Op.24-25. Indeed, HHS entirely failed to account for ongoing (not just one-time)

costs, including those associated with required duplication of staff and contracts for goods and services—costs that can reach millions of dollars for some grantees. Op.*11.

Even using HHS's own numbers, HHS demonstrably underestimated the financial cost of the Separation Requirement by over $200 million. HHS estimated that 15 percent of sites "do not comply with physical separation requirements" because they provide abortions. 84 Fed. Reg. at 7782. HHS combined this 15 percent number with its $30,000 per site cost estimate to arrive at a total estimated cost for the Separation Requirement of $36.08 million. 84 Fed. Reg. at 7782. But the Separation Requirement affects 100 percent of sites, because merely making abortion *referrals* during pregnancy counseling violates the separation requirement, *see id.* at 7717, and every Title X grantee made abortion referrals before the Rule took effect. Thus the estimated total cost—even using HHS's own per-site number—should have been $240 million, not the $36 million the agency estimated.

## III. THE NINTH CIRCUIT ERRED IN HOLDING THAT THE RULE IS NOT ARBITRARY AND CAPRICIOUS

The Ninth Circuit erroneously concluded that the Rule is not arbitrary and capricious. *California*, 2020 WL 878528, at *20-26. The

Ninth Circuit incorrectly resolved the arbitrary and capricious claims without reviewing the entire Administrative Record. *Id.* at *9-10 & n.11. As the district court's opinion shows, the Administrative Record establishes critical facts that the Ninth Circuit did not account for.

The Ninth Circuit ignored—did not even mention—HHS's most egregious errors. The Ninth Circuit's discussion of medical ethics does not mention HHS's failure to cite to any persuasive evidence supporting the agency's conclusion that the Rule is consistent with medical ethics, and instead substitutes the court's own (erroneous) view of medical ethics. 2020 WL 878528, at *24-25 & n.34. The Ninth Circuit does not discuss the fact that HHS repeatedly incorrectly concluded that there was "no evidence"—at all—that the Rule would have adverse impacts on Title X services or Title X providers, 84 Fed. Reg. at 7749, 7775, 7780, 7785, when in fact it had overwhelming evidence of such impacts. *See id.* at *23. And the Ninth Circuit did not address the fact that HHS underestimated the cost of the Separation Requirement for existing providers by at least $200 million by incorrectly concluding that the Separation Requirement would only apply to Title X grantees who

provide abortions (rather than grantees that merely provide referrals). *Id.* at \*23 & n.32.

* * *

This is a case of national importance. Even though it affects billions of dollars in annual health care expenditures, and the health care systems of every City and State, the Rule is overcome with basic errors. The Rule is "inadequately justified and objectively unreasonable." Op.\*2. It simply does not meet the APA's requirements for reasoned decision making and reasoned explanation. The harms the Rule inflicts are serious and nationwide.

## CONCLUSION

The Court should grant initial hearing en banc.

March 6, 2020                    Respectfully submitted,

<u>s/ Suzanne Sangree</u>                    <u>s/ *Andrew Tutt*</u>
Suzanne Sangree                    Andrew T. Tutt
*Senior Counsel for Public Safety &*          Drew A. Harker
  *Director of Affirmative Litigation*         ARNOLD & PORTER KAYE
CITY OF BALTIMORE                    SCHOLER LLP
DEPARTMENT OF LAW                    601 Massachusetts Ave., NW
City Hall, Room 109                    Washington, DC 20001
100 N. Holliday Street                    (202) 942-5000
Baltimore, MD 21202                    andrew.tutt@arnoldporter.com
443-388-2190
suzanne.sangree2@baltimorecity.gov      Priscilla J. Smith
                           REPRODUCTIVE RIGHTS &
Stephanie Toti                       JUSTICE PROJECT AT
LAWYERING PROJECT                    YALE LAW SCHOOL
25 Broadway, Fl. 9                    319 Sterling Place
New York, NY 10004                    Brooklyn, NY 11238
646-490-1083                        priscilla.smith@ylsclinics.org
stoti@lawyeringproject.org

                           Faren M. Tang
                           REPRODUCTIVE RIGHTS &
                           JUSTICE PROJECT AT
                           YALE LAW SCHOOL
                           127 Wall Street
                           New Haven, CT 06511
                           faren.tang@ylsclinics.org

*Counsel for Appellee Mayor and City Council of Baltimore*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing Petition for Initial Hearing En Banc was filed electronically on March 6, 2020 and will, therefore, be served electronically upon all counsel.

s/ *Andrew Tutt*
Andrew T. Tutt

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rules of Appellate Procedure 32(g), the undersigned counsel for appellee certifies that:

1.     This brief complies with the type-volume limitation of Fed. R. App. P. 35(b)(2) because this brief contains 3,865 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a) because this brief has been prepared using Microsoft Office Word and is set in Century Schoolbook font in a size equivalent to 14 points or larger.

s/ *Andrew Tutt*
Andrew T. Tutt

**ADDENDUM**

*Mayor & City Council of Baltimore v. Azar*,
No. CV RDB-19-1103, 2020 WL 758145 (D. Md. Feb. 14, 2020)

KeyCite Blue Flag – Appeal Notification

Appeal Filed by MAYOR AND CITY COUNCIL OF BALT v. ALEX AZAR, II, 4th Cir., February 25, 2020

2020 WL 758145
Only the Westlaw citation is currently available.
United States District Court, D. Maryland.

MAYOR AND CITY COUNCIL
OF BALTIMORE, Plaintiff,

v.

Alex M. AZAR II, Secretary of Health
and Human Services, et al., Defendants.

Civil Action No.: RDB-19-1103
|
Signed 02/14/2020

**Attorneys and Law Firms**

Andre M. Davis, Jane Hannah Lewis, Suzanne Sangree, Baltimore City Department of Law, Baltimore, MD, Andrew T. Tutt, Pro Hac Vice, Drew A. Harker, Pro Hac Vice, Allyson Tracey Himelfarb, Arnold and Porter Kaye Scholer LLP, Washington, DC, Faren M. Tang, Pro Hac Vice, Reproductive Rights and Justice Project, Yale Law School, New Haven, CT, Marisa White, Pro Hac Vice, Arnold and Porter Kaye Scholer LLP, Stephanie Toti, Pro Hac Vice, Lawyering Project, New York, NY, Priscilla Joyce Smith, Pro Hac Vice, RRJP Clinic, Yale Law School, Brooklyn, NY, for Plaintiff.

Tarra DeShields Minnis, Office of the United States Attorney, Baltimore, MD, Bradley Philip Humphreys, United States Department of Justice, Washington, DC, Robert Charles Merritt, US Department of Justice Federal Programs Branch, Richmond, VA, for Defendants.

## MEMORANDUM OPINION

Richard D. Bennett, United States District Judge

**\*1** As has been discussed at length in this Court's Memorandum Opinion of May 30, 2019 (ECF No. 43), the Plaintiff Mayor and City Council of Baltimore ("Baltimore City" or "the City") challenges a rule promulgated by the United States Department of Health and Human Services ("HHS" or "the Government") that would amend federal regulations with respect to the funding of family planning services.[1] This Court granted a Preliminary Injunction

against HHS with respect to Counts I and II, alleging violations of the Non-Interference Provision of the Affordable Care Act, 42 U.S.C. § 18114, and the Non-Directive Mandate of the Continuing Appropriations Act, 2019, Pub. L. 115-245, 132 Stat. 2981, 3070-71 (2018). For the reasons set forth in that Memorandum Opinion of May 30, 2019, this Court held that there was a likelihood of success on the merits with respect to those claims.

[1]   It has been preceded by similar lawsuits in United States District Courts in the states of California, Oregon, Washington, and Maine. *California v. Azar*, Case Nos. 19-cv-1184-EMC, 19-cv-1195-EMC (N. D. Cal. filed Mar. 4, 2019); *Oregon v. Azar*, Case Nos. 6:19-cv-0317-MC, 6:19-cv-0318-MC (D. Or. filed Mar. 5, 2019); *Washington v. Azar*, Case No. 1:19-cv-3040-SAB (E.D. Wash. Filed Mar. 5, 2019); *Family Planning Ass'n of Maine v. HHS*, Case No. 1:19-cv-0100-LEW (D. Me. filed Mar. 6, 2019).

On July 2, 2019, a divided panel of the United States Court of Appeals for the Fourth Circuit granted a stay of that injunction pending appeal. (*See* ECF No. 58.)[2] Subsequently, the Fourth Circuit heard oral argument on the interlocutory appeal of the preliminary injunction on September 18, 2019, and a decision has not been rendered. In the interim, community clinics and health centers in Baltimore have been adversely affected as the rule promulgated by HHS has been implemented and remains in effect. Subsequently, this Court dismissed Count IV and Count X of the original ten-count Complaint without prejudice. (ECF No. 74.)

[2]   While the dissenting opinion adopted the position of this Court, the majority ruled: "Upon consideration of submissions relative to appellants' motion to stay the district court's preliminary injunction pending appeal, the court grants the motion for stay." (ECF No. 58.)

This Court has adhered to a briefing schedule as to the remaining six counts, with Baltimore City and HHS having filed cross-motions for summary judgment. After having held a hearing on January 27, 2020 and having heard the arguments of counsel, this Court has conducted a thorough review of the Administrative Record in this matter. While the Defendant HHS is entitled to Summary Judgment with respect to some of the remaining six counts, specifically Counts III, V, VI, and IX, Baltimore City is entitled to Summary Judgment with

respect to Counts VII and VIII. Specifically, after a thorough review of the Administrative Record in this case, this Court holds that the proposed rule as promulgated violates the Administrative Procedure Act, 5 U.S.C. § 701, *et seq.*, in that it is arbitrary and capricious, being inadequately justified and objectively unreasonable. The Administrative Record reflects that literally every major medical organization in the United States has opposed implementation of this rule. There is almost no professional support for its implementation.

**\*2** Baltimore City originally brought a ten-Count Complaint pursuant to the Administrative Procedure Act ("APA") against Alex M. Azar II, in his official capacity as the Secretary of Health and Human Services; United States Department of Health and Human Services; Diane Foley, M.D., in her official capacity as the Deputy Assistant Secretary, Office of Population Affairs; and Office of Population Affairs. (Compl., ECF No. 1.) The City challenges the final rule ("Final Rule" or "Rule") entitled *Compliance with Statutory Program Integrity Requirements*, 84 Fed. Reg. 7714 (Mar. 4, 2019), *codified at* 42 C.F.R. Part 59. The Final Rule amends the regulations developed to administer Title X of the Public Health Service Act, 42 U.S.C. §§ 300 to 300a-6, which provides federal funding for family-planning services. (*Id.* at ¶¶ 1, 3.)

After an April 30, 2019 hearing, this Court entered a preliminary injunction on May 30, 2019 as to Counts I and II, enjoining enforcement of the Final Rule in the State of Maryland. (*See* ECF Nos. 43, 44.) Injunctive relief was based on this Court's holding that the Final Rule likely violated provisions of the Affordable Care Act, 42 U.S.C. § 18114, enacted in 2010 (as alleged in Count I), and Congress' Non-Directive Mandate in the Continuing Appropriations Act, 2019, Pub. L. 115-245, 132 Stat. 2981, 3070-71 (2018) (as alleged in Count II). In short, this Court held that existing laws passed by the United States Congress cannot be circumvented by administrative orders of the executive branch of government. On July 2, 2019, a divided panel of the United States Court of Appeals for the Fourth Circuit granted the Government's Motion to Stay the Injunction Pending Appeal. (*See* ECF No. 58.) That appeal remains pending and therefore, at this time, the preliminary injunction that this Court granted is stayed, and the Final Rule is in effect. The Fourth Circuit held oral argument on the interlocutory appeal of the preliminary injunction on September 18, 2019, and a decision has not yet been issued. *See Mayor and City Council of Baltimore v. Azar*, No. 19-1614 (4th Cir. filed June 6, 2019).

On September 12, 2019, this Court dismissed without prejudice Count IV (Violation of APA § 706—Contrary to Law—Contrary to Religious Freedom Restoration Act of 1993, 42 U.S.C. § 2000bb-1(a)) and Count X (Violation of APA—Contrary to Constitutional Right—Unconstitutionally Vague), and allowed Counts I, II, III, V, VI, VII, VIII, and IX to proceed on the merits. (ECF No. 74.) Presently pending are the parties' cross-motions for summary judgment on the remaining Counts. (ECF Nos. 81, 82.) This Court held a hearing on January 27, 2020, has heard the arguments of counsel, has reviewed the submissions of the parties, and has reviewed the expansive Administrative Record in this case.

The executive branch of government is not entitled to promulgate administrative rules where an agency's explanation "runs counter to the evidence before the agency."

*See Motor Vehicle Mfrs. Ass'n of the United States v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983). Accordingly, for the reasons that follow, summary judgment IS ENTERED in favor of Plaintiff on Counts VII and VIII. Specifically, after a thorough review of the Administrative Record in this case, this Court holds that the proposed rule as promulgated violates the Administrative Procedure Act in that it is arbitrary and capricious, being inadequately justified and objectively unreasonable. However, summary judgment IS ENTERED in favor of Defendants on Counts III, V, VI, and IX, alleging that the rule as promulgated is contrary to Title X's voluntariness requirement, contrary to constitutional right pursuant to the First Amendment and Equal Protection under the Fifth Amendment, and without observance of procedure required by law. Accordingly, the Government shall be permanently enjoined from implementing or enforcing any portion of the Final Rule in the State of Maryland.

## BACKGROUND

**\*3** The background of this case was discussed at length in this Court's prior Memorandum Opinion of May 30, 2019 granting Plaintiff's Motion for Preliminary Injunction and this Court's prior Memorandum Order of September 12, 2019, granting in part and denying in part Defendants' Motion to Dismiss. (*See* ECF Nos. 43, 74.) In brief, almost fifty years ago, in 1970, Congress enacted Title X, the *only* federal program specifically dedicated to funding family planning services. Public Health Service Act, 84 Stat. 1506,

*as amended* 42 U.S.C. §§ 300 to 300a–6; (Pl.'s Exhibit 4 at PEP109, ECF No. 81-2.)

Title X addresses low-income individuals' lack of equal access to family planning services by authorizing the Secretary of Health and Human Services to "make grants and to enter into contracts with public or nonprofit private entities to assist in the establishment and operation of voluntary family planning projects which shall offer a broad range of acceptable and effective family planning methods and services." *Id.* § 300(a). Section 1008 of the Act provides that "[n]one of the funds appropriated under this subchapter shall be used in programs where abortion is a method of family planning." *Id.* § 300a–6. Consistent with this restriction, HHS has never permitted Title X grantees to use Title X funds to perform or subsidize abortions. *See* 42 C.F.R. §§ 59.5(a)(5), 59.9 (1986).

Title X programs provide sexual and reproductive healthcare with priority given to low-income individuals. (Pl.'s Exhibit 4 at PEP112, ECF No. 81-2.) Services include a broad range of contraceptive options; contraceptive education and counseling; breast and cervical cancer screening; testing, referral, and prevention education for sexually transmitted infections/diseases ("STIs/STDs"), including human immunodeficiency virus ("HIV"); and pregnancy diagnosis and counseling. (*Id.* at PEP109, PEP118-120.)

### I. The Final Rule.

On May 22, 2018, HHS posted on its website a notice of proposed rulemaking entitled *Compliance With Statutory Program Integrity Requirements*, 83 Fed. Reg. 25,502 ("Proposed Rule"). *See* 84 Fed. Reg. 7714, 7726 (Mar. 4, 2019). The Proposed Rule was published in the Federal Register on June 1, 2018. *Id.*; 83 Fed. Reg. 25,502 (June 1, 2018). During the 60-day public comment period, HHS received more than 500,000 comments.[3] On March 4, 2019, HHS published the Final Rule in the Federal Register. 84 Fed. Reg. 7714 (Mar. 4, 2019), *codified at* 42 C.F.R. Part 59. The Final Rule contains two key provisions that are central to Baltimore City's claims in this case: (1) the counseling restriction or "Gag Rule" that prohibits health professionals from providing their patients with abortion referral information even when requested, except "[i]n cases in which emergency care is required"; and (2) the separation requirement, which requires that all abortion services, and any medical services not complying with the Gag Rule, be physically separated from clinics that provide Title X

services. 84 Fed. Reg. at 7747-48, 7788-89. Most of the Rule's provisions, including the counseling restriction, had an implementation date of May 3, 2019 and are now in effect nationwide.[4] *Id.* at 7714. Compliance with the separation requirement is required by March 4, 2020. *Id.*

[3]  Discussed *infra* on page 7.

[4]  *See infra* at page 9, discussing the status of injunctions.

### A. Gag Rule.

The Gag Rule provision of the Final Rule provides that a "Title X project may not perform, promote, refer for, or support abortion as a method of family planning, nor take any other affirmative action to assist a patient to secure such an abortion." 84 Fed. Reg. at 7788-89 (codified at 42 C.F.R. § 59.14(a)). If a client specifically requests a referral to an abortion provider, the Title X grantee can at most offer a list of "comprehensive primary health care providers ... some, but not the majority" of which may "also provide abortion." *Id.* at 7789. The list cannot identify which providers provide the abortion services she is requesting. The project staff are prohibited from answering a direct inquiry about which providers provide abortion. *Id.* Specialized reproductive health care providers are excluded because the list is limited to "comprehensive primary health care providers." *Id.* At the same time, Title X providers must provide all pregnant patients with a referral for prenatal care, regardless of the patients' wishes, on the basis that prenatal referrals are "medically necessary." *Id.*

**\*4** The Final Rule does permit referrals for abortion "in cases in which emergency care is required." *Id.* at 7789 (codified at 42 C.F.R. § 59.14(b)(2)). However, the example provided for such emergency is when a "Title X project discovers an ectopic pregnancy in the course of conducting a physical examination of a client." *Id.* (codified at 42 C.F.R. § 59.14(e)(2)). The Rule also explains that "in cases involving rape and/or incest, it would not be considered a violation of the prohibition on referral for abortion as a method of family planning if a patient is provided a referral to a licensed, qualified, comprehensive health service provider who also provides abortion." 84 Fed. Reg. at 7747 n.76.

**B. Separation requirement.**

The separation requirement mandates that Title X activities be "physically and financially separate" (defined as having an "objective integrity and independence") from prohibited activities, such as the provision of abortion services and any referrals for abortion services that do not meet the Gag Rule requirements. 84 Fed. Reg. at 7789 (codified at 42 C.F.R. § 59.15). "Mere bookkeeping separation of Title X funds from other monies is not sufficient." *Id.* Whether a Title X provider meets this requirement is determined by the Secretary based on "a review of facts and circumstances," including but not limited to the following relevant factors:

> (a) The existence of separate, accurate accounting records; (b) The degree of separation from facilities (e.g., treatment, consultation, examination and waiting rooms, office entrances and exits, shared phone numbers, email addresses, educational services, and websites) in which prohibited activities occur and the extent of such prohibited activities; (c) The existence of separate personnel, electronic or paper-based health care records, and workstations; and (d) The extent to which signs and other forms of identification of the Title X project are present, and signs and material referencing or promoting abortion are absent.

*Id.*

The Preamble to the Final Rule explains, "[a]s long as the Title X clinic and the hospital facilities where abortions are performed are not collocated or located adjacent to each other within a hospital building or complex, it is highly likely that the hospital is not violating the requirement." *Id.* at 7767. However, at a "free-standing clinic, physical separation might require more circumstances to be taken into account in order to satisfy a clear separation between Title X services and abortion services," and such a clinic "would likely present greater opportunities for confusion between Title X and

abortion services, including, for example, the same entrances, waiting rooms, signage, examination rooms, and the close proximity between Title X and impermissible services." *Id.* The deadline for physical separation is March 4, 2020. *Id.* at 7714.

**II. Administrative Record.**

The Administrative Record ("Record" or "AR") contains more than 500,000 comments submitted during the 60-day comment period. The Record comprises more than 400,000 pages and was provided to the Court on two CDs. (*See* ECF Nos. 78, 80.) The Final Rule garnered comments from the American Medical Association (AR 269330); American Academy of Family Physicians (AR 104075); American Academy of Nursing (AR 107970); American College of Obstetricians and Gynecologists (AR 268836); American Academy of Pediatrics (AR 277786); and the American College of Physicians (AR 281203). Literally every major medical organization in the United States has noted its opposition to the Final Rule. In addition, comments were submitted from the Baltimore City Health Department (AR 245402); City Health Department Leaders from Kansas City, Boston, San Antonio, Chicago, Los Angeles, Cleveland, and Baltimore City (AR 245623); State Attorneys General from the States of Washington, Oregon, Vermont, and the Commonwealth of Massachusetts (AR 278551); Planned Parenthood (AR 316400); Guttmacher Institute (AR 264415); and the American Civil Liberties Union (AR 305722), among many others.

**\*5** In addition to public comments, the Administrative Record contains previous HHS Title X rules and regulations, executive orders, Supreme Court cases, statutes including the Affordable Care Act and the HHS Appropriations Act of 2018, reports from the United States Congress, and internet news and journal articles. (*See* AR 397110 – AR 407171.)

**III. Title X in Baltimore City.**

Title X has been providing $1,430,000 each year to the City of Baltimore and serves over 16,000 patients per year. (Pl.'s Exhibit 7 at PEP365, ECF No. 81-2.) As of 2019, the City directly has operated three community clinics and four school-based health centers that provide Title X services, and it has overseen Title X funding to ten subgrantee health clinics in the community, including clinics at Johns Hopkins University, Baltimore Medical System, Family Health Centers of Baltimore, and University of Maryland, in addition to clinics offering comprehensive care in middle

and high schools. (Pl.'s Exhibit 8 at PEP380-81, ECF No. 81-2.) Planned Parenthood operated additional Title X sites in Baltimore City until it withdrew its Title X participation in August of 2019 as a result of the Final Rule. (Pl.'s Mot. at 4-5, ECF No. 81-1; Pl.'s Exhibit 8 at PEP390, ECF No. 81-2; Amicus Brief at 14 n.44, ECF No. 89.)

Of the 16,000 women, men, and minors who received care from Title X clinics in Baltimore City in 2017, 86% had incomes at or below the federal poverty line. (*Id.* at PEP381.) Title X centers serve one third of women in Baltimore City who need publicly funded contraceptive services. (*Id.*) Baltimore City has experienced a 55% reduction in teen pregnancy over the last ten years, which its public health officials attribute to the assistance of Title X funding. (*Id.* at 383, 103 S.Ct. 2856; Pl.'s Exhibit 9 at PEP 396-97, ECF No. 81-2.)

### IV. Procedural Setting.

This case is one of multiple cases that have been filed across the nation challenging HHS's Final Rule. *See California v. Azar*, Case Nos. 19-cv-1184-EMC, 19-cv-1195-EMC (N. D. Cal. filed Mar. 4, 2019); *Oregon v. Azar*, Case Nos. 6:19-cv-0317-MC, 6:19-cv-0318-MC (D. Or. filed Mar. 5, 2019); *Washington v. Azar*, Case No. 1:19-cv-3040-SAB (E.D. Wash. Filed Mar. 5, 2019); *Family Planning Ass'n of Maine v. HHS*, Case No. 1:19-cv-0100-LEW (D. Me. filed Mar. 6, 2019). Preliminary injunctions were issued by the California, Oregon, and Washington courts. *California v. Azar*, 385 F. Supp. 3d 960 (N.D. Cal. 2019); *Oregon v. Azar*, 389 F. Supp. 3d 898 (D. Or. 2019); *Washington v. Azar*, 376 F. Supp. 3d 1119 (E.D. Wash. 2019). On June 20, 2019, the United States Court of Appeals for the Ninth Circuit granted a stay of the preliminary injunctions that were granted in the California, Oregon, and Washington State cases. *California v. Azar*, 927 F.3d 1068 (9th Cir. 2019) (per curiam). An *en banc* rehearing of the stay decision was held on September 23, 2019 and remains pending. *See* 927 F.3d 1045 (9th Cir. July 3, 2019). In the Maine case, the District Court denied the plaintiff's motion for a nation-wide injunction, which it had previously withdrawn and renewed after the stay of the nation-wide injunctions was granted. *Family Planning Ass'n of Maine v. HHS*, 404 F. Supp. 3d 286 (D. Me. 2019).

In the instant case, Plaintiff originally asserted ten causes of action: (I) Violation of Administrative Procedure Act ("APA"), 5 U.S.C. § 706—Contrary to Law—Contrary to Affordable Care Act ("ACA")'s Non-Interference Provision, 42 U.S.C. § 18114; (II) Violation of APA § 706 —Contrary to Law—Contrary to Nondirective Mandate of the Consolidated Appropriations Act of 2018; (III) Violation of APA § 706—Contrary to Law—Contrary to Tile X, 42 U.S.C. §§ 300(a), 300a(a); (IV) Violation of APA § 706—Contrary to Law—Contrary to Religious Freedom Restoration Act of 1993 ("RFRA"), 42 U.S.C. § 2000bb-1(a); (V) Violation of APA § 706—Contrary to Constitutional Right—First Amendment; (VI) Violation of APA—Contrary to Constitutional Right—Equal Protection Under Fifth Amendment; (VII) Violation of APA— Arbitrary and Capricious—Inadequately Justified; (VIII) Violation of APA—Arbitrary and Capricious—Objectively Unreasonable; (IX) Violation of APA—Without Observance of Procedure Required by Law; and (X) Violation of APA— Contrary to Constitutional Right—Unconstitutionally Vague. (Compl., ECF No. 1.)

**\*6** Baltimore City also filed a Motion for Preliminary Injunction (ECF No. 11), which this Court granted on May 30, 2019, enjoining enforcement of the Final Rule in the State of Maryland. (*See* ECF Nos. 43, 44.) The Court's decision addressed the likelihood of success on the merits of only Counts I and II. (ECF No. 43.) The Court declined to address the likelihood of success on the merits of Plaintiff's arbitrary and capricious claims (Counts VII and VIII) because "[t]he 'searching and careful inquiry of the [administrative record]' that is required to determine if it is likely that HHS's rule-making in this instance was arbitrary and capricious would be more prudently handled on a fully-developed record." (*Id.* at 23 (quoting *Casa de Maryland v. U.S. Dep't of Homeland Security*, 924 F.3d 684, 703 (4th Cir. 2019)).)

On June 6, 2019, Defendants filed a Notice of Interlocutory Appeal (ECF No. 48; USCA No. 19-1614) and a Motion to Stay the Injunction Pending Appeal (ECF No. 49). This Court denied the stay motion (ECF No. 56), but a divided panel of the Fourth Circuit granted Defendants' motion to stay pending appeal (ECF No. 58). Baltimore City filed an Emergency Motion for Rehearing *en banc* to vacate the stay of injunction, and that motion was denied on September 3, 2019. (*See* ECF No. 73.) Oral argument on the interlocutory appeal of this Court's preliminary injunction was held on September 18, 2019, and a decision has not yet been issued.

Defendants also filed a Motion to Stay Proceedings Pending Appeal (ECF No. 62) and a Motion to Dismiss (ECF No. 67). This Court denied the Motion to Stay Proceedings (ECF No. 70) and granted in part and denied in part the Motion to Dismiss (ECF No. 74). Specifically, the Court dismissed without prejudice Count IV (Violation of APA § 706—Contrary to Law—Contrary to Religious Freedom Restoration Act of 1993 ("RFRA"), 42 U.S.C. § 2000bb-1(a)) and Count X (Violation of APA—Contrary to Constitutional Right—Unconstitutionally Vague), and allowed Counts I, II, III, V, VI, VII, VIII, and IX to proceed on the merits. (ECF No. 74.)

On October 17, 2019, Defendants filed separately two CDs containing the Administrative Record. (ECF No. 80.) Subsequently, the parties filed cross-motions for summary judgment on the remaining Counts, for which a hearing was held on Monday, January 27, 2020. (ECF Nos. 81, 82, 91.) The Court has considered the submissions of the parties, has heard the arguments of counsel, and has conducted a careful and searching inquiry of the Administrative Record. For the reasons that follow, Defendant HHS is entitled to Summary Judgment with respect to some of the remaining six counts, specifically Counts III, V, VI, and IX. Baltimore City is entitled to Summary Judgment with respect to Counts VII and VIII. Specifically, after a thorough review of the Administrative Record in this case, this Court holds that the proposed rule as promulgated violates the Administrative Procedure Act in that it is arbitrary and capricious, being inadequately justified and objectively unreasonable.

## STANDARD OF REVIEW

The Administrative Procedure Act ("APA"), 5 U.S.C. § 701, *et seq.*, in conjunction with the federal-question jurisdiction statute, provides the statutory basis for a court to review a final agency action. Claims seeking review of an agency action under the APA "are adjudicated without a trial or discovery, on the basis of an existing administrative record ... [and accordingly] are properly decided on summary judgment." *Audubon Naturalist Soc'y of the Cent. Atl. States, Inc. v. U.S. Dep't of Transp.*, 524 F. Supp. 2d 642, 659 (D. Md. 2007). The standard set forth in Rule 56 of the Federal Rules of Civil Procedure governing summary judgment, however, "does not apply because of the limited role of a court reviewing the administrative record." *Hospira,*

*Inc. v. Burwell*, No. GJH-14-2662, 2014 WL 4406901, at *9 (D. Md. Sept. 5, 2014) (citing *Roberts v. United States*, 883 F. Supp. 2d 56, 62-63 (D.D. C Mar. 23, 2012); *Kaiser Found. Hosps. v. Sebelius*, 828 F. Supp. 2d 193, 197-98 (D.D.C. 2011)). Rather, summary judgment is the mechanism by which the court decides as a matter of law whether "the administrative record permitted the agency to make the decision it did." *Id.* (quoting *Kaiser Found. Hosps.*, 828 F. Supp. 2d at 198).

**\*7** The APA requires a reviewing court to:

> hold unlawful and set aside agency action ... found to be ... (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege, or immunity; (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; [or] (D) without observance of procedure required by law....

5 U.S.C. §§ 706(2)(A)-(D).

The arbitrary and capricious standard requires a reviewing court to consider whether the agency:

> Relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983). A court must uphold an action if the record shows that the agency had a rational basis for the decision; the court may

not "substitute its judgment for that of the agency." *State Farm*, 463 U.S. at 43, 103 S.Ct. 2856; *Defenders of Wildlife v. North Carolina Dep't of Transp.*, 762 F.3d 374, 396 (4th Cir. 2014). This is a "highly deferential standard which presumes the validity of the agency's action," *Natural Resources Defense Council v. EPA*, 16 F.3d 1395, 1400 (4th Cir. 1993), and an agency's decision should only be overruled upon a finding that the agency has "failed to consider relevant factors and committed a clear error of judgment." *Md. Dep't of Health & Mental Hygiene v. Ctrs. for Medicare & Medicaid Servs.*, 542 F.3d 424, 428 (4th Cir. 2008) (citation omitted); *see also Ohio Valley Environmental Coalition v. Aracoma Coal Co.*, 556 F.3d 177, 192 (4th Cir. 2009).

When reviewing an agency decision, the Court "must engage in a searching and careful inquiry of the [administrative] record, so that [it] may consider whether the agency considered the relevant factors and whether a clear error of judgment was made." *Casa de Maryland v. U.S. Dep't of Homeland Security*, 924 F.3d 684, 703 (4th Cir. 2019) (quoting *Friends of Back Bay v. U.S. Army Corps of Eng'rs*, 681 F.3d 581, 587 (4th Cir. 2012)).

### ANALYSIS

This case presents a unique procedural posture. Counts I and II are on appeal in conjunction with the United States Court of Appeals for the Fourth Circuit's review of this Court's state-wide preliminary injunction.[5] In addition, Counts IV and X of the original ten-count Complaint were dismissed without prejudice. (ECF No. 74.) The remaining six Counts, specifically Count III (Violation of APA § 706—Contrary to Law—Contrary to Tile X, 42 U.S.C. §§ 300(a), 300a(a)), Count V (Violation of APA § 706—Contrary to Constitutional Right—First Amendment), Count VI (Violation of APA—Contrary to Constitutional Right—Equal Protection Under Fifth Amendment), Count VII (Violation of APA—Arbitrary and Capricious—Inadequately Justified), Count VIII (Violation of APA—Arbitrary and Capricious—Objectively Unreasonable), and Count IX (Violation of APA—Without Observance of Procedure Required by Law) are ripe for review.

[5]  In its Memorandum Opinion and Order granting Plaintiff's Motion for Preliminary Injunction, the

Court found that Plaintiff was likely to succeed on the merits of Count I (Violation of Administrative Procedure Act ("APA"), 5 U.S.C. § 706—Contrary to Law—Contrary to Affordable Care Act ("ACA")'s Non-Interference Provision, 42 U.S.C. § 18114) and Count II (Violation of APA § 706—Contrary to Law—Contrary to Nondirective Mandate of the Consolidated Appropriations Act of 2018). (ECF Nos. 43, 44.) The Court determined that the Final Rule likely violates the Affordable Care Act's non-interference provision "by creating unreasonable barriers for patients to obtain appropriate medical care, interfering with communications between the patient and health care provider, and restricting full disclosure, which violates the principles of informed consent." (ECF No. 43 at 18.) The Court also determined that the Final Rule likely violates the non-directive mandate of the 2018 appropriations act because "[r]equiring providers to refer a patient to prenatal health care even when the patient has expressly stated that she does not want prenatal care is coercive, not 'nondirective.' " (*Id.* at 20.) The Court rejected Defendants' arguments that *Rust v. Sullivan*, 500 U.S. 173, 111 S.Ct. 1759, 114 L.Ed.2d 233 (1991), foreclosed Plaintiff's claims under Counts I and II because Plaintiff relies on "violations of laws passed by Congress and enacted after *Rust* was decided." (*Id.* at 16.)

This Court will not dispose of Counts I and II as they remain on appeal in connection with the Fourth Circuit's review of this Court's preliminary injunction. *See Allstate Ins. Co. v. McNeill*, 382 F.2d 84, 88 (4th Cir. 1967) ("an appeal from an order granting or refusing an injunction brings before the appellate court the entire order, not merely the propriety of the injunctive relief ... the appellate court may consider and decide the merits"); *see also* 11A Wright & Miller, Fed. Prac. & Proc. § 2962 (3d ed. 2019) ("If an interlocutory appeal is taken, the appellate court may consider the merits of the case, to the extent they relate to the propriety of granting the injunctive relief....").

### I. The Gag Rule and the Separation Requirement provisions of the Final Rule are arbitrary and capricious (Counts VII and VIII).

**\*8** This Court declined to join with its sister courts in undertaking an arbitrary and capricious analysis in the context of its preliminary injunction finding because such an analysis "would be more prudently handled on a fully-developed record." (ECF No. 43 at 23.) Having carefully reviewed the Administrative Record in this case, this Court is compelled to find that HHS's promulgation of the Final Rule was arbitrary and capricious for three key reasons.[6] First, HHS has inadequately explained its decision to "disagree" with comments by every major medical organization regarding the Final Rule's contravention of medical ethics. Second, HHS inadequately considered the "reliance interests" that would be disrupted by its change in policy. Finally, HHS inadequately considered the likely costs and benefits of the physical separation requirement.

[6]  Plaintiff asserted two additional grounds supporting its arbitrary and capricious claims. Specifically, Plaintiff argued that HHS failed to explain its departure from HHS's prior interpretation of the non-directive mandate that non-directive pregnancy counseling includes pregnancy referrals, and that HHS inadequately explained the limitation requiring only advanced practice providers ("APPs"). These arguments are unpersuasive because HHS did indeed recognize and explain its departure from its prior interpretations and also explained that "APPs are qualified, due to their advanced education, licensing, and certification to diagnose and treat patients while advancing medical education and clinical research." *See* 84 Fed. Reg. at 7716-17, 7728 & n.41-42. HHS's explanation of its departure is consistent with the principle from *Encino Motorcars LLC v. Navarro*, ––– U.S. –––, 136 S.Ct. 2117, 2126, 195 L.Ed.2d 382 (2016) that an agency acts arbitrarily and capriciously where it fails to "display awareness that it is changing position" and "show that there are good reasons for the change." In any event, Plaintiff's claims do not rise and fall on these arguments.

### A. HHS failed to explain how the Final Rule is consistent with medical ethics.

A "searching and careful inquiry" of the record reveals that literally all of the nation's major medical organizations have grave medical ethics concerns with the Final Rule.

HHS had before it comments from the American College of Obstetricians and Gynecologists, the American Medical Association ("AMA"), the American Academy of Family Physicians, the American Academy of Nursing, the American Academy of Pediatrics, and the American College of Physicians. (*See* AR 268836; AR 269330; AR 104075; AR 107970; AR 277786; AR 281203.) Every single one of these organizations stated that the Final Rule would violate the established principles of medical ethics. ( *Id.*) The American College of Obstetricians and Gynecologists, which comprises 90% of the nation's obstetricians and gynecologists cautioned that the Rule "would put the patient-physician relationship in jeopardy by placing restrictions on the ability of physicians to make available important medical information, permitting physicians to withhold information from pregnant women about the full range of their options, and erecting greater barriers to care, especially for minority populations." (AR 268838.) The American College of Obstetricians and Gynecologists further noted that the prenatal referral requirement "would further limit the care options offered to patients, and is not consistent with evidence-based medicine." (AR 268840.)

The AMA, citing to its *Code of Medical Ethics*, explained that the gag rule "would not only undermine the patient-physician relationship, but also could force physicians to violate their ethical obligations ... to counsel patients about all of their options in the event of a pregnancy." (AR 269332.) The American Academy of Family Physicians, the American Academy of Nursing, the American Academy of Pediatrics, and the American College of Physicians raised similar concerns. (*See* AR 104075; AR 107970; AR 277786; AR 281203.) Planned Parenthood Federation of America and four states (Washington, New York, Hawaii, and Oregon) all notified HHS that they would have to exit the Title X program because the restrictions are "fundamentally at odds with the professional and ethical obligations of health care professionals." (AR 316414.) The American Academy of Nursing commented that "these rules prioritize ideology over evidence-based professional recommendations and the government's own independent evaluations," and urged HHS "to remain religiously and morally neutral in its funding, policies, and activities to ensure that individuals [ ] do not receive a limited scope of services and that the ethical obligations of healthcare providers are not compromised." (AR 107975.)

**\*9** In the face of these grave concerns from all of the nation's leading medical organizations, HHS declared that

it "disagrees with commenters contending the proposed rule ... infringes on the legal, ethical, or professional obligations of medical professionals." 84 Fed. Reg. at 7724. With absolutely no support from any significant leading medical association in the United States, HHS has responded that, "the Department believes that the final rule adequately accommodates medical professionals and their ethical obligations while maintaining the integrity of the Title X program." *Id.* Further, "[t]he Department believes that medical ethics, regulations concerning the practice of medicine, and malpractice liability standards are not inconsistent with this final rule," because "[t]he Supreme Court upheld similar conditions and restrictions in 🚩▲*Rust* as a constitutionally permissible exercise of Congress's Spending Power." *Id.* at 7748. Finally, Defendants argue that HHS noted that the restrictions are necessary to ensure compliance with the federal conscience statutes, including the Church Amendment, the Coats-Snowe Amendment, and the Weldon Amendment. *Id.* at 7716.

The arbitrary and capricious standard requires this Court to consider whether the agency:

> Relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

🚩*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983). An agency "must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.' " 🚩*Id.* (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168, 83 S.Ct. 239, 245-46, 9 L.Ed.2d 207 (1962)). None of Defendants' explanations square with what is required of the agency under 🚩*State Farm.* There is no question that HHS has "offered an explanation for its decision that runs counter to the evidence before the agency." 🚩*Id.*

It has indeed rendered an opinion for which there is no evidentiary support.

As a preliminary matter, Defendants' argument that the conscience statutes explain HHS's decision that the Final Rule is consistent with medical ethics is misplaced. In HHS's explanation for its disagreement with the comments on medical ethics, it does not mention the conscience statutes. 84 Fed. Reg. at 7724, 7748. Accordingly, the Court will not "supply a reasoned basis for the agency's action that the agency itself has not given." 🚩*State Farm*, 463 U.S. at 43, 103 S.Ct. 2856 (quoting *SEC v. Chenery Corp.*, 332 U.S. 194, 67 S.Ct. 1575, 1577, 91 L.Ed. 1995 (1947)).

HHS's entire justification for disagreement with the comments regarding medical ethics is that 🚩▲*Rust* would not have upheld similar regulations if they were inconsistent with medical ethics. 🚩▲*Rust*, however, never addressed the implications of the 1988 regulations on medical ethics and noted only in dicta that "[u]nder the Secretary's regulations ... a doctor's ability to provide, and a woman's right to receive, information concerning abortion and abortion-related services outside the context of the Title X project remains unfettered." 🚩▲500 U.S. at 203, 111 S.Ct. 1759.

Furthermore, 🚩▲*Rust* did not evaluate the 2019 Final Rule and the Administrative Record that HHS considered in promulgating it. As the United States District Court for the Northern District of California explained, "[t]he justifications supporting the 1988 regulations upheld in 🚩▲*Rust* cannot insulate the Final Rule from review now, almost three decades later." 🚩*California v. Azar*, 385 F. Supp. 3d 960, 1001 (N.D. Cal. 2019).

Nowhere in the Final Rule does the HHS provide a reasoned basis for its disagreement with the medical ethics concerns outlined by the nation's major medical organizations. HHS did not identify any code of medical ethics, any medical organization, or any medical provider who could confirm HHS's belief that medical ethics permit healthcare providers to comply with the gag rule's restrictive counseling on abortion. At the summary judgment motions hearing of January 27, 2020, Defendants conceded as much in response to this Court's questioning whether there was anything in the record that counters the medical ethics concerns raised by the professional organizations. (*See* Jan. 27, 2020 Hr'g Tr. at 25:23-26:4, ECF No. 92 ("**The Court**: We looked through the

record. I can find no record of any professional organization of any kind that has disputed the position taken by those organizations I've just mentioned with respect to the matter of the medical ethics. But if I'm wrong, tell me. **Counsel for HHS**: No, you're right about that point, Your Honor.").)

**\*10** To be sure, HHS was not required to demonstrate that any professional organization supported the Rule, but it was required to provide a reasoned explanation for its disagreement with the medical ethics concerns of every major medical association in the country, while simultaneously finding the Final Rule consistent with medical ethics. *See* 🔖 *State Farm*, 463 U.S. at 43, 103 S.Ct. 2856 ("the agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.' ") (quoting 🔖 *Burlington Truck Lines v. United States*, 371 U.S. 156, 168, 83 S.Ct. 239, 245-46, 9 L.Ed.2d 207 (1962)). This, it did not do. At the motions hearing, Defendants asserted, without explanation, that "the agency unquestionably addressed concerns about medical ethics, it considered them and it came to a different conclusion as to whether medical ethics would be violated." (*See* Jan. 27, 2020 Hr'g Tr. at 33:3-6, ECF No. 92.) It may well be that the agency considered the concerns, but the agency has failed to articulate a satisfactory explanation for its "different conclusion" from the nation's leading medical organizations. Such agency action is plainly arbitrary and capricious.

### B. HHS did not account for reliance interests.

HHS also failed to adequately consider how the Rule would disrupt access for many who rely on Title X services. HHS "conclude[d] these final rules will contribute to more clients being served, gaps in service made, and improved client care," and stated that "commenters did not provide evidence that the rule will negatively impact the quality or accessibility of Title X services." 84 Fed. Reg. at 7723, 7780. In stark contrast to HHS's assertions, the administrative record is replete with comments by both Title X grantees and non-grantees alike who provided evidence that the Final Rule would leave millions with reduced access to healthcare. HHS had before it evidence from the Baltimore City Health Department, City Health Department Leaders, Planned Parenthood, Guttmacher Institute, National Family Planning & Reproductive Health Association, and the American Medical Association, among others, all of which

detailed how the Rule would limit access to Title X care and force a large number of providers out of the Title X program. (*See* AR 245402; AR245623; AR316400; AR 264415; AR 308011; AR 269330.) Indeed, Planned Parenthood withdrew its Title X participation in August of 2019 as a result of the Final Rule. (Pl.'s Mot. at 4-5, ECF No. 81-1; Pl.'s Exhibit 8 at PEP390, ECF No. 81-2; Amicus Brief at 14 n.44, ECF No. 89.)

For example, the AMA commented that the Final Rule places Title X patients at risk because "[i]n states that have excluded certain providers from their family planning programs, research shows serious public health consequences." (AR 269333.) To support this assertion, the AMA cited a study published in the *New England Journal of Medicine* that found that blocking patients from Planned Parenthood in Texas resulted in a 35% decline in women in publicly-funded programs using the most effective form of birth control and denying women access to the contraceptive care they needed resulted in a 27% increase in births among women who had previously used the most effective form of birth control. (*Id.*)

A public health researcher and professor in the Departments of Pediatrics and Obstetrics, Gynecology & Reproductive Sciences at the University of California, San Francisco, provided HHS with data reflecting the impact of the Rule on Title X providers, concluding that the Rule "radically underestimates the costs that it will impose on patients, providers, and society." (*See* AR 388063-388065.) In addition, the Guttmacher Institute provided a detailed chart showing the state-by-state impact if Planned Parenthood alone withdrew from the Title X program. (AR 264435-264436.) The chart shows that, as of 2015, 39% of women receiving Title X services in Maryland were served at Planned Parenthood centers. (*See* AR 264435.)

HHS, contrary to the overwhelming evidence in the record, decided that more clients would be served and gaps in service would be closed, resulting in improved client care. HHS cited only one comment that suggested a support for that position. The Christian Medical Association contends that new providers who do not support the provision of abortion services may enter the program. *See* 84 Fed. Reg. at 7780 n.138. However, HHS entirely ignored the evidence that raised concerns about the Final Rule's reducing access to Title X services nationwide.

#### C. HHS did not account for compliance costs.

**\*11** HHS did not adequately consider the likely costs of the physical separation requirement. HHS estimated that a Title X provider would face a compliance cost of $30,000. [7] 84 Fed. Reg. at 7782. HHS reasoned that there were uncertainties associated with the requirement and that "entities will usually choose the lowest cost method to come into compliance." Id. at 7781-82. In contrast, the administrative record reflects comments estimating the likely cost of the requirement far exceeds HHS's estimate of $30,000. Comments from City Health Department Leaders, the Center for Reproductive Rights, the Family Planning Council of Iowa, Planned Parenthood, and the Guttmacher Institute, among others, all estimated costs well beyond $30,000 to comply with the separation requirement. (See AR 245623; AR 315959; AR 279351; AR 316400; AR 264415.)

[7]     The estimate in the Proposed Rule was $20,000. See 83 Fed. Reg. 25502, 25525 (June 1, 2018.)

A comment by City Health Department Leaders from Baltimore, Kansas City, Boston, San Antonio, Chicago, Los Angeles, and Cleveland, estimated that the Rule would impose ongoing compliance costs, such as the administrative cost of maintaining separate accounts for funding streams and associated staffing needs. (AR 245623-245624.) Planned Parenthood estimated average capital costs of nearly $625,000 per affected service site. (AR 316430-316431.) The Center for Reproductive Rights noted that hiring one additional full-time staff member would cost well more than the proposed rule's $20,000 estimate. (AR 315994.) The Family Planning Council of Iowa explained, "it typically costs hundreds of thousands, or even millions, of dollars to locate and open any health care facilities (and would also cost much more than $10,000-30,000 to establish even an extremely simple and limited office), staff it, purchase workstations, set up record-keeping systems, etc." (AR 279362.)

After reviewing the administrative record, this Court concurs with its sister court in the Northern District of California that "HHS's conclusory response to commenters' evidence-backed concerns about the serious problems the physical separation requirement will cause flies in the face of established APA principles." California v. Azar, 385 F. Supp. 3d at 1010. Under the arbitrary and capricious standard, the Court may not "substitute its judgment for that of the

agency." State Farm, 463 U.S. at 43, 103 S.Ct. 2856. The Court must, however, set aside agency action that it finds to be arbitrary and capricious when the agency "entirely fail[s] to consider an important aspect of the problem, offer[s] an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." Id. In this case, for all of the reasons explained above, the Court is compelled to set aside the Final Rule as arbitrary and capricious. Thus, summary judgment is entered in favor of Plaintiff on Counts VII and VIII.

#### D. Injunctive Relief.

Plaintiff seeks declaratory and permanent injunctive relief restraining the enforcement, operation, and execution of the Final Rule by enjoining Defendants, their agents, employees, appointees, or successors, from enforcing, threatening to enforce, or otherwise applying the provisions of the Final Rule against Baltimore City and its subgrantees. (Compl. at 67, ECF No. 1.) For the reasons explained supra as to Counts VII and VIII, Baltimore City shall be granted declaratory relief and a permanent injunction of the Final Rule in the State of Maryland. As the Court acknowledged previously in granting the preliminary injunction (ECF No. 43), Baltimore City is close in proximity to multiple other States and municipalities whose people make use of its health system. Loss of funding in neighboring states will put pressure on Baltimore's health system, as mobile patients come from neighboring communities to make use of Baltimore's resources. In this case, a permanent injunction that is limited to Maryland is narrowly tailored to avoid irreparable harm to the sole Plaintiff, Baltimore City. [8]

[8]     As noted in its Memorandum Opinion granting Plaintiff's preliminary injunction, this Court is cognizant of the skepticism regarding the increased issuance of nationwide injunctions by United States District Judges. (See ECF No. 43 at 27 n.12 (citing Trump v. Hawaii, —— U.S. ——, 138 S. Ct. 2392, 2424–25, 201 L.Ed.2d 775 (2018)); California v. Azar, 385 F. Supp. 3d 960, 1021 (N.D. Cal. 2019)). In his recent concurrence granting a stay of a nationwide injunction, Justice Gorsuch addressed "the increasingly common practice of trial courts ordering relief that

transcends the cases before them." *Dep't of Homeland Security, et al. v. New York, et al.*, No. 19A785, 589 U.S. ——, 140 S.Ct. 599, —— L.Ed.2d —— (Jan. 27, 2020) (Gorsuch, J., concurring). He explained, "these orders share the same basic flaw—they direct how the defendant must act toward persons who are not parties to the case," but "[e]quitable remedies, like remedies in general, are meant to redress the injuries sustained by a particular plaintiff in a particular lawsuit." *Id.* Here, the Court has provided only the necessary relief for the particular Plaintiff in this case, Baltimore City.

## II. HHS complied with the APA's rule-making procedures (Count IX).

**\*12** Plaintiff's challenge to HHS's compliance with the APA's rule-making procedures fails. Administrative agencies are required, under the APA, to comply with certain procedures before issuing a rule. 5 U.S.C. § 553; *North Carolina Growers' Ass'n, Inc. v. United Farm Workers*, 702 F.3d 755, 763 (4th Cir. 2012). "Generally stated, the APA's rulemaking provisions require that the agency publish a notice of proposed rule-making in the Federal Register; permit interested parties the opportunity to comment on the proposed rule; and, after considering the submitted comments, issue a concise general statement of the rule's purpose along with the final rule." *Mayor and City Council of Baltimore v. Trump*, Civil Action No. ELH-18-3636, 2019 WL 4598011, at \*22 (D. Md. Sept. 20, 2019) (citing 5 U.S.C. § 553; *N.C. Growers' Ass'n, Inc.*, 702 F.3d at 763). The Fourth Circuit has instructed that courts "must be strict in reviewing an agency's compliance with procedural rules." *Id.* (quoting *N.C. Growers Ass'n, Inc.*, 702 F.3d at 764).

When a party challenges the adequacy of notice of a change in a proposed rule occurring after the comment period, the Fourth Circuit applies the "logical outgrowth test." *See Chocolate Mfrs. Ass'n of U.S. v. Block*, 755 F.2d 1098, 1105 (4th Cir. 1985). "Notice is 'adequate' if the changes in the original plan 'are in character with the original scheme,' and the final rule is a 'logical outgrowth' of the notice and comments already given." *Id.* If the final rule "substantially departs from the terms or substance of the proposed rule," then the notice is inadequate. *Id.* (quoting *Rowell v. Andrus*, 631 F.2d 699, 702 n.2 (10th Cir. 1980)).

Plaintiff argues that HHS's 60-day comment period deprived the public of a meaningful opportunity to comment on the Rule and that the advanced practice provider ("APP") requirement was not a logical outgrowth of the proposed rule. As Plaintiff concedes, however, 60 days is generally accepted as the "reasonable minimum time for comment" on a typical rule. (ECF No. 81-1 at 24 (citing *Petry v. Block*, 737 F.2d 1193, 1201 (D.C. Cir. 1984)). Despite Plaintiff's belief that this Rule warranted an extension of the comment period because the proposal was "complex or based on scientific or technical data," Plaintiff cites no authority finding a 60-day comment period unreasonable. Plaintiff's reliance on *Hollingsworth v. Perry*, 558 U.S. 183, 130 S.Ct. 705, 175 L.Ed.2d 657 (2010) is misplaced, as *Hollingsworth* did not involve a comment period under the APA, but instead addressed the propriety of a thirty-day comment period for amendments to a federal court's local rules, pursuant to 28 U.S.C. § 2071(b) and Federal Rule of Civil Procedure 83(a). *See* 558 U.S. at 191-93, 130 S.Ct. 705. Moreover, this Court does not have authority to "impose upon the agency its own notion of which procedures are best." *See Vermont Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 549, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978). Simply put, HHS did not violate APA's rule-making procedures by implementing a 60-day comment period.

**\*13** With respect to the APP requirement, HHS has contended that this requirement was a logical outgrowth of the proposed rule because HHS clearly indicated in the proposed rule that it was considering limiting which professionals would be qualified to perform counseling. In fact, the proposed rule contained an even stricter limitation that only physicians could perform counseling. *See* 83 Fed. Reg. 25502, 25507, 25518, 25531 (June 1, 2018). Thus, the change from allowing only physicians to allowing advanced practice providers to perform counseling was not a substantial departure from the terms of the proposed rule.

*See California v. Azar*, 385 F. Supp. 3d 960, 1019-21 (N.D. Cal. 2019) (holding that HHS did not violate the APA's notice and comment procedures because the APP requirement was a logical outgrowth of the proposed rule). Accordingly, summary judgment is entered in favor of Defendants on Count IX.

## III. The Final Rule does not violate Title X (Count III).

Plaintiff asserts that the gag rule violates Title X's voluntariness requirement and that 🔖⚠️*Rust* never addressed this particular argument. Title X provides in relevant part that:

> The acceptance by any individual of [Title X] family planning services or ... information (including educational materials) ... shall be voluntary and shall not be a prerequisite to eligibility for or receipt of any other service or assistance from, or to participation in, any other program of the entity or individual that provided such service or information.

42 U.S.C. § 300a-5. Plaintiff relies on HHS's January 2001 "Program Guidelines for Project Grants for Family Planning Services," which explained that "[u]se by any individual of project services must be solely on a voluntary basis. Individuals must not be subjected to coercion to receive services or to use or not to use any particular method of family planning." (*See* Pl.'s Exhibit 41 at PEP904, ECF No. 81-2.) The Final Rule reaffirms this principle: "This final rule continues the historical Title X emphasis that family planning must be voluntary—the definition of 'family planning' adopted by the final rule, and thus, applicable to the Title X program explicitly states that 'family planning methods and services are never to be coercive and must always be strictly voluntary.' " 84 Fed. Reg. at 7724.

Plaintiff's argument must fail because the voluntariness requirement predates the Supreme Court's decision in 🔖⚠️*Rust*, which, contrary to Plaintiff's assertion, had before it the argument that the 1988 regulations violated Title X. *See* Reply Br. For State Petitioners at 6-7, *Rust v. Sullivan* (No. 89-1392), 1990 WL 505761 (Oct. 15, 1990).

The petitioners in ⚠️*Rust* argued that "Title X itself provides that '[t]he acceptance by any individual of family planning services ... shall be voluntary.' By withholding relevant information from Title X beneficiaries, the Secretary prevents them from making the informed, voluntary family planning decisions that Congress intended to facilitate." *Id.* Despite this argument, the Supreme Court found that "[t]he broad language of Title X plainly allows the Secretary's

construction of the statute." 🔖⚠️500 U.S. at 184, 111 S.Ct. 1759. While Plaintiff urges this Court to find the gag rule violates Title X in the same way that this Court found the rule likely violates the ACA and the 2018 appropriations act, the Court made clear that its preliminary injunction finding was based on the "Final Rule's violations of laws passed by Congress and enacted *after Rust* was decided." (ECF No. 43 at 16 (emphasis added).) In contrast, Title X's voluntariness requirement predates ⚠️*Rust*, and the Supreme Court found the same rule at issue to be consistent with Title X. Accordingly, summary judgment is entered in favor of Defendants on Count III.

## IV. 🔖⚠️*Rust v. Sullivan* forecloses Plaintiff's constitutional claims (Counts V and VI).

**\*14** Plaintiff argues that the Final Rule violates both the First Amendment to the United States Constitution and the equal protection component of the Due Process Clause of the Fifth Amendment. The Supreme Court's decision in 🔖⚠️*Rust* forecloses both arguments. This Court notes that its earlier ruling that 🔖⚠️*Rust* does not foreclose Plaintiff's claims as to the Affordable Care Act (Count I) and the Appropriations Act (Count II) should not be taken to mean that the Final Rule is unconstitutional, as asserted by the Plaintiff.

### A. First Amendment claim (Count V).

The First Amendment to the United States Constitution states in pertinent part that "Congress shall make no law ... abridging the freedom of speech." U.S. CONST. amend. I. It is undisputed that the 1988 regulations, considered in 🔖⚠️*Rust*, established a broader prohibition on abortion counseling than the 2019 regulations. *Compare* 53 Fed. Reg. 2922, 2945 (Feb. 2, 1988) ("a Title X project may not provide counseling concerning the use of abortion as a method of family planning or provide referral for abortion as a method of family planning"), *with* 84 Fed. Reg. 7714, 7788-89 (Mar. 4, 2019) ("A title X project may not perform, promote, refer for, or support abortion as a method of family planning, nor take nay other affirmative action to assist a patient to secure such an abortion.").

In 🔖⚠️*Rust*, the Supreme Court upheld the 1988 regulations and found that they did not violate the First Amendment.

500 U.S. at 192-200, 111 S.Ct. 1759. Specifically, the Supreme Court explained that the 1988 regulations "refus[ed] to fund activities, including speech, which are specifically excluded from the scope of the project funded," and the Constitution generally permits "the Government [to] choose not to subsidize speech." *Id.* at 194-95, 200, 111 S.Ct. 1759. The Court noted that the Government is "simply insisting that public funds be spent for the purposes for which they were authorized." *Id.* at 196, 111 S.Ct. 1759.

Despite Plaintiff's efforts to distinguish the constitutional arguments made here with those presented to the *Rust* Court, this Court is bound by the Supreme Court's finding that an even stricter abortion counseling provision is consistent with the First Amendment. First, the Supreme Court in *Rust* clearly stated that the "Title X program regulations do not significantly impinge upon the doctor-patient relationship." 500 U.S. at 200, 111 S.Ct. 1759. Plaintiff asserts, without support, that Title X patients have become more reliant on their doctors since *Rust*. Consequently, Plaintiff insists that the Supreme Court's decision in *Legal Services Corporation v. Velazquez*, 531 U.S. 533, 121 S.Ct. 1043, 149 L.Ed.2d 63 (2001), finding that the government cannot interfere with traditional relationships like the attorney-client relationship, should govern here to find that the 2019 regulations interfere with the doctor-patient relationship. Plaintiff relies on Justice Scalia's dissent in *Velazquez* suggesting that *Rust*'s finding as to the doctor-patient relationship was in serious doubt. *See* 531 U.S. at 553-54, 121 S.Ct. 1043 (Scalia, J., dissenting). However, the majority in *Velazquez* distinguished *Rust* and the doctor-patient relationship, explaining, "[t]he advice from the attorney to the client and the advocacy by the attorney to the courts cannot be classified as governmental speech even under a generous understanding of the concept. In this vital respect this suit is distinguishable from *Rust*." 531 U.S. at 543, 121 S.Ct. 1043.

Second, Plaintiff's argument that the Supreme Court's decision in *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995), rather than *Rust*, controls here, because Title X is not a "government-messaging program" anymore.

In *Rosenberger*, Supreme Court applied strict scrutiny to a government program that was intended to fund the private speech of students, not to fund a government message. 515 U.S. at 830-37, 115 S.Ct. 2510. Again, the Court distinguished *Rust*, explaining, "[t]here [in *Rust*], the government did not create a program to encourage private speech but instead used private speakers to transmit specific information pertaining to its own program." *Id.* at 833, 115 S.Ct. 2510. Plaintiff cites no authority that Congress intended to change the nature of the Title X program, nor has the Supreme Court so indicated.

**\*15** Finally, Plaintiff argues that *Rust* did not address the withholding of information from patients and patients' rights to receive truthful information. Whether the *Rust* Court addressed this specific argument is of no significance, as the Court ultimately upheld as consistent with the First Amendment an even stricter form of the gag rule that required providers to withhold *all* information regarding abortion. *See* 500 U.S. at 193-94, 111 S.Ct. 1759 ("[A] doctor employed by the project may be prohibited in the course of his project duties from counseling abortion or referring for abortion. This is not a case of the Government 'suppressing a dangerous idea,' but of a prohibition on a project grantee or its employees from engaging in activities outside of the project's scope."). Defendants are granted summary judgment on Count V.

### B. Fifth Amendment claim (Count VI). [9]

[9]     Defendants briefly argue that Plaintiff lacks standing to bring its equal protection claim. At the dismissal stage, the Court determined that Plaintiff's allegations sufficed to establish standing. (ECF No. 74 at 11-12.) There is no reason for the Court to find otherwise at the summary judgment stage, as Plaintiff has provided ample citation to the record to support its allegations of injury to Baltimore City as a result of the Rule, including comments from the City's Health Commissioner and, more specifically, the fact of Planned Parenthood's departure from the Title X program.

Plaintiff's Fifth Amendment arguments are equally unsuccessful. The equal protection component of the Due Process Clause of the Fifth Amendment "prohibits the government from intentionally treating one group differently than other similarly situated groups where no rational basis exists for doing so." *Mayor and City Council of Baltimore v. Trump*, Civil Action No. ELH-18-3636, 2019 WL 6970631, at *9 (D. Md. Dec. 19, 2019) (citing *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985)); *see also Bolling v. Sharpe*, 347 U.S. 497, 499, 74 S.Ct. 693, 98 L.Ed. 884 (1954). Classifications based on sex must survive heightened scrutiny and the burden of justification for the classification lies with the government defendant. *See Goulart v. Meadows*, 345 F.3d 239, 260 (4th Cir. 2003); *United States v. Virginia*, 518 U.S. 515, 116 S.Ct. 2264, 135 L.Ed.2d 735 (1996). The government must show that the challenged classification "serves important government objectives and that the discriminatory means employed are substantially related to the achievement of those objectives." *Virginia*, 518 U.S. at 533, 116 S.Ct. 2264.

When reviewing a restriction on abortion funding, the Supreme Court has explained that the "constitutional test applicable to government abortion-funding restrictions is not the heightened-scrutiny standard that our cases demand for sex-based discrimination, but the ordinary rationality standard." *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 273, 113 S.Ct. 753, 122 L.Ed.2d 34 (1993) (citing *Maher v. Roe*, 432 U.S. 464, 97 S.Ct. 2376, 53 L.Ed.2d 484 (1977); *Harris v. McRae*, 448 U.S. 297, 100 S.Ct. 2671, 65 L.Ed.2d 784 (1980)).

Plaintiff asserts that the Final Rule is subject to heightened scrutiny because it is based on stereotypes rather than physical differences between women and men. *See Nev. Dep't of Human Res. v. Hibbs*, 538 U.S. 721, 730-31, 123 S.Ct. 1972, 155 L.Ed.2d 953 (2003). Plaintiff argues that the Rule reflects "different sex-role expectations of male and female patients," because the Rule requires referral for prenatal care of a pregnant woman visiting a Title X clinic, but it does not place the same requirement on a man visiting a Title X clinic who discloses that his wife is pregnant. (ECF No. 81-1 at 33.)

Try as it may, Plaintiff cannot escape the fact that the restrictions at issue here are promulgated under a program that prohibits federal funds to be used to refer for abortion, and as the Fourth Circuit has explained, "[t]he rationality of distinguishing between abortion services and other medical services when regulating physicians or women's healthcare has long been acknowledged by Supreme Court precedent." *Greenville Women's Clinic v Bryant*, 222 F.3d 157, 173 (4th Cir. 2000). The distinction the regulations make based on sex is the result of the simple fact that only women can get pregnant. Under *Bray*, Defendants need only provide a rational basis for the Rule, which is satisfied by HHS's determination that prenatal care is medically necessary for a pregnant woman and unborn child, a consideration that does not apply to non-pregnant Title X patients, whether they are non-pregnant women or men. Accordingly, summary judgment is granted in favor of Defendants on Count VI.

## V. Severability

**\*16** Defendants urge the Court not to vacate the Final Rule in its entirety. The APA requires that courts "set aside agency action" "not in accordance with law." 5 U.S.C. § 706(2)(A). "Whether an administrative agency's order or regulation is severable ... depends on the issuing agency's intent." *North Carolina v. FERC*, 730 F.2d 790, 795-96 (D.C. Cir. 1984) (citing *FPC v. Idaho Power Co.*, 344 U.S. 17, 20-21, 73 S.Ct. 85, 97 L.Ed. 15 (1952)). "[T]he ultimate determination of severability will rarely turn on the presence or absence" of a severability clause. *Cmty. for Creative Non-Violence v. Turner*, 893 F.2d 1387, 1394 (D.C. Cir. 1990) (quoting *United States v. Jackson*, 390 U.S. 570, 585 n.27, 88 S.Ct. 1209, 20 L.Ed.2d 138 (1968)).

The test for severability of a subsection of an agency's regulations turns on "whether severance of the subsection would 'impair the function of the statute as a whole,' so that 'the regulation would not have been passed but for its inclusion.' " *West Virginia Ass'n of Community Health Ctrs., Inc. v. Sullivan*, 737 F. Supp. 929, 942 (S.D. W. Va. 1990) (quoting *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 108 S.Ct. 1811, 100 L.Ed.2d 313 (1988)). This "two-part inquiry involv[es] (1) an examination of the functional independence of the section to determine whether it is an 'integral' part of the whole, and (2) an examination of the agency's intent in enacting the regulations." *Id.* (citations

omitted). If there is "substantial doubt" that the issuing agency would have promulgated the rule in the absence of the challenged portion, then "partial affirmance is improper." *North Carolina v. FERC*, 730 F.2d at 795-96.

The Final Rule contains a severability clause providing, "[t]o the extent a court may enjoin any part of the rule, the Department intends that other provisions or parts of the provisions should remain in effect." 84 Fed. Reg. 7714, 7725 (Mar. 4, 2019). There is authority in this circuit finding that similar provisions in the 1988 Title X regulations, specifically the prohibition on abortion counseling and referral and the physical separation requirement, could be severed from the regulations as a whole, because the remaining provisions were "functionally independent of the other[s] in that [they are] directed at specific conduct as varied as pro-abortion lobbying and the use of Title X project funds for payment of dues to groups advocating abortion as a method of family planning."

*See* West Virginia Ass'n of Community Health Ctrs., Inc., 737 F. Supp. at 943 (S.D. W. Va. 1990). That holding is distinguishable because that court set aside the agency action on the basis that certain provisions were constitutionally impermissible, not because the agency acted arbitrarily and capriciously in promulgating the rule. *See* id. at 941 n.10 ("the court concludes that HHS provided a reasoned basis for promulgating the new regulations").

Here, the Final Rule labels the gag rule and the physical separation requirement as "[m]ajor [p]rovisions," 84 Fed. Reg. at 7715, while the 1988 regulations made no such representation. *See* 53 Fed. Reg. 2922 (Feb. 2, 1988). Moreover, the remaining provisions either incorporate by reference the gag rule and/or the physical separation requirement provisions or include language similar to that used in those provisions such that the Court is unable to delineate which remaining provisions could or should survive. For example, subsection 59.5 entitled "What requirements must be met by a family planning project?", uses the same language from the gag rule: "provide, promote, refer for, or support abortion as a method of family planning." 42. U.S.C. § 59.5.

**\*17** Apart from relying on the severability provision, Defendants have not explained how the provisions should be severed. Indeed, in the summary judgment motions hearing, Defendants relied only on the severability provision in arguing that Defendants would "prefer" that the entire Rule not be vacated if the Court granted summary judgment in favor of Plaintiff. (*See* Jan. 27, 2020 Hr'g Tr. at 43:23-44:1, ECF No. 92.) The Court finds that the gag rule and the physical separation requirement are not functionally independent provisions, and indeed, has substantial doubts that HHS would have promulgated the rule in the absence of the challenged portions. Accordingly, the Court will permanently enjoin the entirety of the Final Rule in the State of Maryland.

### CONCLUSION

For the foregoing reasons:

1. Plaintiff's Motion for Summary Judgment (ECF No. 81) is GRANTED IN PART AND DENIED IN PART;

2. Defendants' Motion for Summary Judgment (ECF No. 82) is GRANTED IN PART AND DENIED IN PART;

3. JUDGMENT IS ENTERED in favor of Plaintiff with respect to Counts VII and VIII;

4. JUDGMENT IS ENTERED in favor of Defendants with respect to Counts III, V, VI, and IX;

5. The Defendants, and all other officers, agents, employees and attorneys of the Department of Health and Human Services, are PERMANENTLY ENJOINED in the State of Maryland from implementing or enforcing the Health and Human Services Final Rule, entitled *Compliance with Statutory Program Integrity Requirements*, 84 Fed. Reg. 7,714 (Mar. 4, 2019), *codified at* 42 C.F.R. Part 59.

A separate Order follows.

### All Citations

Slip Copy, 2020 WL 758145

---

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

 © 2020 Thomson Reuters. No claim to original U.S. Government Works.