# UNITED STATES COURT OF APPEALS
# FOR THE FOURTH CIRCUIT

MAYOR AND CITY COUNCIL OF BALTIMORE,

*Plaintiff-Appellee,*

v.

ALEX M. AZAR II, in his official capacity as the Secretary of Health and Human Services, et al.,

*Defendants-Appellants,*

On Appeal from the United States District Court for the District of Maryland, Case No. 1:19-cv-01103, Hon. Richard D. Bennett

**BRIEF OF AMICI CURIAE PROFESSORS ZACHARY CLOPTON, AMANDA FROST, SUZETTE MALVEAUX, MILA SOHONI, AND ALAN TRAMMELL SUPPORTING APPELLEE**

JAMES R. SIGEL
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, CA 94105
Telephone: (415) 268-6948
JSigel@mofo.com

*Counsel for Amici*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................... ii

INTERESTS OF AMICI CURIAE .............................................................1

INTRODUCTION AND SUMMARY OF ARGUMENT .......................3

ARGUMENT ...............................................................................................4

I.  THE HISTORY OF EQUITY DOES NOT COMPEL FEDERAL COURTS TO REFRAIN FROM ISSUING INJUNCTIONS THAT PROTECT NONPARTIES ...........................................................................4

    A.  Traditional Equity Practice Permitted Bills Of Peace And Other Injunctions That Protected The Rights Of Nonparties .........................5

    B.  Traditional Equity Included A Concept Of Privity .............................7

    C.  The History Of Nonmutual Preclusion Provides Additional Support For Universal Injunctions .......................................................10

II.  HISTORICAL RESEARCH FURTHER ESTABLISHES THAT FEDERAL AND ENGLISH COMMON-LAW COURTS ISSUED ORDERS PROTECTING NONPARTIES...................................................11

    A.  Traditional English (And American) Courts Used Common Law Writs To Achieve The Functional Equivalent Of Universal Injunctions ........................................................................................12

    B.  Claims Regarding The Absence Of Injunctions Protecting Nonparties In U.S. Courts Are Overstated .........................................14

III.  PRECEDENT DOES NOT PROHIBIT FEDERAL COURTS FROM ISSUING INJUNCTIONS THAT PROTECT NONPARTIES...................15

IV.  ARTICLE III DOES NOT PRECLUDE FEDERAL COURTS FROM ISSUING INJUNCTIONS THAT PROTECT NONPARTIES...................19

CONCLUSION .........................................................................................23

# TABLE OF AUTHORITIES

**Cases**

*B&B Hardware, Inc. v. Hargis Indus., Inc.*,
 575 U.S. 138 (2015)......................................................20

*Califano v. Yamasaki*,
 442 U.S. 682 (1979)................................................18, 20

*Chicago, Rock Island & Pac. R.R. Co. v. Schendel*,
 270 U.S. 611 (1926)......................................................10

*City of Chicago v. Sessions*,
 888 F.3d 272 (7th Cir. 2018) .......................................18

*eBay Inc. v. MercExchange, L.L.C.*,
 547 U.S. 388 (2006)......................................................17

*FDA v. Brown & Williamson Tobacco Corp.*,
 529 U.S. 120 (2000)......................................................22

*Gunter v. Atl. Coast Line R.R. Co.*,
 200 U.S. 273 (1906)....................................................8, 9

*Hills v. Gautreaux*,
 425 U.S. 284 (1976)......................................................20

*Langan v. Johnson & Johnson*,
 897 F.3d 88 (2d Cir. 2018) ..........................................19

*Lewis Publishing Co. v. Morgan*,
 229 U.S. 288 (1913)......................................................14

*Morrison v. YTB Int'l, Inc.*,
 649 F.3d 533 (7th Cir. 2011) .......................................19

*Nat'l Spiritual Assembly of Bahá'ís of U.S. Under Hereditary
 Guardianship, Inc. v. Nat'l Spiritual Assembly of Bahá'ís of U.S.,
 Inc.*,
 628 F.3d 837 (7th Cir. 2010) .......................................10

*Parklane Hosiery Co. v. Shore*,
439 U.S. 322 (1979)..............................................................8, 10, 11, 18

*Pierce v. Society of Sisters*,
268 U.S. 510 (1925)..............................................................14

*Plains Commerce Bank v. Long Family Land and Cattle Co.*,
554 U.S. 316 (2008)..............................................................21

*Regal Knitwear Co. v. NLRB*,
324 U.S. 9 (1945)..............................................................8

*Scott v. Donald*,
165 U.S. 107 (1897)..............................................................8, 9

*Sibbach v. Wilson & Co.*,
312 U.S. 1 (1941)..............................................................7

*Taylor v. Sturgell*,
553 U.S. 880 (2008)..............................................................10

*Baker ex rel. Thomas v. Gen. Motors Corp.*,
522 U.S. 222 (1998)..............................................................10, 20

*Town of Chester v. Laroe Estates, Inc.*,
137 S. Ct. 1645 (2017)..............................................................19

*Trump v. Hawaii*,
138 S. Ct. 2392 (2018)..............................................................4, 5, 6, 9

*United States v. Des Moines Valley R.R. Co.*,
84 F. 40 (8th Cir. 1897)..............................................................10

*United States v. Mendoza*,
464 U.S. 154 (1984)..............................................................3, 15, 16, 17, 19

*Verlinden B.V. v. Central Bank of Nigeria*,
461 U.S. 480 (1983)..............................................................21

*West Virginia Board of Education v. Barnette*,
319 U.S. 624 (1943)..............................................................15

*Wilson v. Alexander*,
    276 F. 875 (5th Cir. 1921) ...................................................9

**Statutes & Rules**

5 U.S.C. § 706 ....................................................................22

28 U.S.C. § 2072(b) ............................................................7

Fed. R. Civ. P. 2 ................................................................13

**Other Authorities**

7A Wright & Miller, Fed. Prac. & Proc. § 1751 (3d ed. 2019) ...............................5

11A Wright & Miller, Fed. Prac. & Proc. § 2956 (3d ed. 2019) ...........................8

18A Wright & Miller, Fed. Prac. & Proc. § 4465.4 (3d ed. 2019) ........................15

Alan M. Trammell, *Demystifying Nationwide Injunctions*,
    98 TEX. L. REV. 67 (2019) ...............................................16

Amanda Frost, *In Defense of Nationwide Injunctions*,
    93 N.Y.U. L. REV. 1065 (2018) ....................................5, 16

Brief of Amici Curiae Legal Historians in Support of Plaintiff-
    Appellee the City of Chicago, *City of Chicago v. Barr*,
    No. 18-2885, (7th Cir. Nov. 15, 2018), 2018 U.S. 7th Cir. Briefs
    LEXIS 41 ...............................................................6, 7, 14

E. H. Schopler, *Who May Institute Civil Contempt Proceedings*,
    61 A.L.R.2d 1083 (1958) ...................................................8

James E. Pfander & Jacob Wentzel, *The Common Law Origins of* Ex
    parte Young, 72 STAN. L. REV. __ (forthcoming 2020),
    https://papers.ssrn.com/sol3/ .........................................12, 13

Joseph Story, COMMENTARIES ON EQUITY PLEADINGS (2d ed. 1840) .......................6

Mila Sohoni, *The Lost History of the "Universal" Injunction*,
    133 HARV. L. REV. 920 (2020) .......................................6, 14

Order, *Journal of Commerce & Commercial Bulletin v. Burleson*,
    229 U.S. 600 (1913) (No. 818), https://perma.cc/4KDR-J4HA .................14

Restatement (First) Judgments § 83 (1942)......................................................8

Samuel L. Bray, *Multiple Chancellors: Reforming the National
    Injunction*, 131 HARV. L. REV. 417 (2017)..........................................6

Stephen C. Yeazell, FROM MEDIEVAL GROUP LITIGATION TO THE
    MODERN CLASS ACTION (1987).........................................................5

Suzette M. Malveaux, Response, *Class Actions, Civil Rights, and the
    National Injunction*, 131 HARV. L. REV. F. 56 (2017).......................16

Thomas D. Rowe, Jr., *A Distant Mirror: The Bill of Peace in Early
    American Mass Torts and Its Implications for Modern Class
    Actions*, 39 ARIZ. L. REV. 711 (1997).................................................5

U.S. Const. art. III, § 2........................................................................13

Zachary D. Clopton, *National Injunctions and Preclusion*,
    118 MICH. L. REV. 1 (2019)...............................................................16

# INTERESTS OF AMICI CURIAE[1]

Amici are law professors and legal scholars with expertise in civil procedure and federal jurisdiction. Amici have an interest in the proper understanding of the authority of the federal courts. Amici submit that the Government's assertion that federal courts cannot issue injunctions that protect nonparties is not supported by history, precedent, or Article III of the Constitution. Amici have published the following recent articles reflecting their expertise on the matter before this Court: Zachary D. Clopton, *National Injunctions and Preclusion*, 118 MICH. L. REV. 1 (2019); Amanda Frost, *In Defense of Nationwide Injunctions*, 93 N.Y.U. L. REV. 1065 (2018); Suzette M. Malveaux, Response, *Class Actions, Civil Rights, and the National Injunction*, 131 HARV. L. REV. F. 56 (2017); Mila Sohoni, *The Lost History of the "Universal" Injunction*, 133 HARV. L. REV. 920 (2020); Alan M. Trammell, *Demystifying Nationwide Injunctions*, 98 TEX. L. REV. 67 (2019).

**Zachary D. Clopton** is a professor of law at Northwestern Pritzker School of Law. His research and academic interests include civil procedure and federal courts. His scholarship has appeared in the Stanford Law Review, Michigan Law

---

[1] All parties have consented to the filing of this brief. No counsel for a party authored this brief in whole or in part, and no party or counsel for a party made a monetary contribution intended to fund the preparation or submission of this brief. No person other than amici or their counsel made a monetary contribution to the preparation or submission of this brief.

Review, California Law Review, NYU Law Review, and University of Chicago Law Review.

**Amanda Frost** is a professor of law at American University Washington College of Law. She writes and teaches in the fields of constitutional law, immigration and citizenship law, federal courts and jurisdiction, and judicial ethics. Her articles have appeared in the Duke Law Journal, Northwestern Law Review, NYU Law Review, and Virginia Law Review, among other publications, and she authors the "Academic Round-up" column for SCOTUSblog.

**Suzette Malveaux** is a professor of law at the University of Colorado Law School and director of the Byron R. White Center for the Study of American Constitutional Law. She writes and teaches in the areas of civil procedure, complex litigation, civil rights, and employment discrimination. Her articles have appeared in the Harvard Law Review Forum, George Washington Law Review, and Washington University Law Review, and she co-authored *Class Actions and Other Multi-Party Litigation: Cases and Materials* (2d ed. 2006, 3d ed. 2012).

**Mila Sohoni** is a professor of law at the University of San Diego School of Law. She writes and teaches in the areas of civil procedure, administrative law, federal courts, and health care reform. Her articles have recently appeared in the Harvard Law Review, Georgetown Law Journal, Virginia Law Review, University of Pennsylvania Law Review, and Duke Law Journal.

**Alan Trammell** is a professor of law at the University of Arkansas School of Law (Fayetteville). He writes and teaches in the areas of civil procedure, federal courts, and conflict of laws. His most recent scholarship has appeared in the Virginia Law Review, Texas Law Review, Cornell Law Review, Vanderbilt Law Review, and Notre Dame Law Review.

## INTRODUCTION AND SUMMARY OF ARGUMENT

The Government asks this Court to categorically prohibit injunctions that protect nonparties. But neither history, nor precedent, nor Article III of the Constitution supports a categorical rule. Instead, whether such an injunction should issue is a complex, fact-sensitive question that must be resolved on a case-by-case basis.

Although critics of so-called universal injunctions claim that the history of equity compels their categorical prohibition, these critics misunderstand that history. English and American courts have for centuries protected nonparties through bills of peace, privity, and common law writs. Indeed, there are early examples of federal courts using the type of injunction challenged in this case.

Precedent provides critics of universal injunctions with equally little support. The Government, for example, suggests that *United States v. Mendoza*, 464 U.S. 154 (1984), implies that nonparties should *never* benefit from judgments against the federal government. Yet that decision shows only that the scope of relief may

account for policy considerations; it does not support a blanket prohibition on universal injunctions.

Finally, any contention that nonparty relief conflicts with Article III is misplaced. It is well established that federal-court authority is not limited to parties who can demonstrate Article III standing. The effects of a contrary holding would be severe, as it would preclude Congress from authorizing relief protecting nonparties even in limited and well-defined areas.

Unless and until Congress provides guidance to the federal courts on the proper scope of relief, federal courts may use their equitable discretion to account for the important policy issues raised by universal injunctions. Settled law supports such a measured approach—one that is far preferable to the unjustified categorical prohibition that the Government requests.

## ARGUMENT

### I. THE HISTORY OF EQUITY DOES NOT COMPEL FEDERAL COURTS TO REFRAIN FROM ISSUING INJUNCTIONS THAT PROTECT NONPARTIES

In his concurring opinion in *Trump v. Hawaii*, Justice Thomas criticized "universal injunctions," which he described as "[i]njunctions that prohibit the Executive Branch from applying a law or policy against anyone." 138 S. Ct. 2392, 2424 (2018). Justice Thomas's critique focused on history. *Id.* at 2424-29. He reasoned that federal courts' authority to grant equitable relief "must comply with

[the] longstanding principles of equity that predate this country's founding," and that "[u]niversal injunctions do not seem to comply with those principles." *Id.* at 2426. The Government now adopts this argument. Gov. Supp. Br. 47.

But history demonstrates that traditional principles of equity *did* allow for injunctions that protected nonparties. Moreover, a changing legal landscape further calls into question the vitality of the historical case against universal injunctions. Historical practice thus does not compel a categorical rule prohibiting federal courts from exercising their equitable discretion to issue injunctions that protect nonparties.

### A. Traditional Equity Practice Permitted Bills Of Peace And Other Injunctions That Protected The Rights Of Nonparties

First, it cannot be disputed that "bills of peace" protected nonparties at equity. *See generally, e.g.,* Stephen C. Yeazell, From Medieval Group Litigation to the Modern Class Action 24-26 (1987) (discussing bills of peace); 7A Wright & Miller, Fed. Prac. & Proc. § 1751 (3d ed. 2019) (same); Thomas D. Rowe, Jr., *A Distant Mirror: The Bill of Peace in Early American Mass Torts and Its Implications for Modern Class Actions*, 39 Ariz. L. Rev. 711 (1997) (same); Amanda Frost, *In Defense of Nationwide Injunctions*, 93 N.Y.U. L. Rev. 1065 (2018) (same). That fact alone demonstrates that criticisms of universal injunctions sweep too broadly.

Even universal-injunction critics acknowledge that the early history of equity permitted bills of peace that protected nonparties. Justice Thomas, for example, wrote in his *Trump v. Hawaii* concurring opinion:

> [O]ne of the recognized bases for an exercise of equitable power was the avoidance of "multiplicity of suits." Courts would employ "bills of peace" to consider and resolve a number of suits in a single proceeding. And some authorities stated that these suits could be filed by one plaintiff on behalf of a number of others.

138 S. Ct. at 2427 (citations omitted). Similarly, Professor Samuel Bray concedes that bills of peace are "probably the closest analogy in traditional equity to the [universal] injunction." Samuel L. Bray, *Multiple Chancellors: Reforming the National Injunction*, 131 HARV. L. REV. 417, 426 (2017).

Yet these critics fail to acknowledge the implications of this history. The very existence of bills of peace undermines any argument that the history of equity categorically precludes injunctive relief benefitting nonparties. Bills of peace did not require that all affected persons become parties, a feature that remained true of representative actions at least through the beginning of the twentieth century. *See*, *e.g.*, Mila Sohoni, *The Lost History of the "Universal" Injunction*, 133 HARV. L. REV. 920, 964, 976 n.364 (2020); Joseph Story, COMMENTARIES ON EQUITY PLEADINGS §§ 76a-76c, 77-135 (2d ed. 1840); Brief of Amici Curiae Legal Historians in Support of Plaintiff-Appellee the City of Chicago at 8-12, *City of Chicago v. Barr*, No. 18-2885, (7th Cir. Nov. 15, 2018), 2018 U.S. 7th Cir. Briefs

LEXIS 41.[2]  As a result, any categorical claims about the scope of equitable remedies are unsupported.

Regardless, it was not just bills of peace that protected nonparties at equity. Equity courts also issued ordinary injunctions that had the effect of protecting the rights of nonparties, including in public nuisance cases and in early officer suits. *See id.* at 12-14 (citing, *inter alia*, *Mayor of Georgetown v. Alexandria Canal Co.*, 37 U.S. 91 (1838); *Corning v. Lowerre*, 6 Johns. Ch. 439, 1822 WL 1753 (N.Y. Ch. 1822); *Belknap v. Belknap*, 2 Johns. Ch. 463, 1817 WL 1598 (N.Y. Ch. 1817); *Bonaparte v. Camden & A.R. Co.*, 3 F. Cas. 821 (C.C.D.N.J. 1830)).  There can thus be little question that traditional equity practice did not require that an injunction's scope be strictly limited to parties.

## B. Traditional Equity Included A Concept Of Privity

Second, and frequently overlooked by universal-injunction critics, injunctive relief also traditionally extended beyond parties through the doctrine of privity.

---

[2] Some critics of nonparty-protecting injunctions seek to wish away this history by arguing that the modern class action replaces the bill of peace.  But these critics fail to show how a Federal Rule of Civil Procedure could deprive federal courts of the judicial power to resolve cases and controversies that they would have held without that Rule.  *See*, *e.g.*, *Sibbach v. Wilson & Co.*, 312 U.S. 1 (1941); 28 U.S.C. § 2072(b).  Moreover, these critics' attempt to connect bills of peace and class actions undermines their broader claims about universal injunctions, as they must acknowledge that the requirements of bills of peace and modern class actions are not identical.  So, too, federal courts may issue nonparty-protecting injunctions even without identifying exact replicas in the history of equity.

Injunctions traditionally bound privies. *See, e.g., Regal Knitwear Co. v. NLRB*, 324 U.S. 9, 14 (1945) (describing "the common-law doctrine that a decree of injunction not only binds the parties defendant but also those identified with them in interest, in 'privity' with them, represented by them or subject to their control"); 11A Wright & Miller, Fed. Prac. & Proc. § 2956 (3d ed. 2019); Restatement (First) Judgments § 83 (1942).

Privies also could be protected by injunctions. *See*, *e.g.*, Restatement (First) Judgments § 83 ("A person who is not a party but who is in privity with the parties in an action terminating in a valid judgment is, to the extent stated in §§ 84-92, bound by and *entitled to the benefits of* the rules of res judicata.") (emphasis added). Privies could sue for civil contempt. *See* E. H. Schopler, *Who May Institute Civil Contempt Proceedings*, 61 A.L.R.2d 1083 (1958). And privies could enforce injunctions against former parties. *See Gunter v. Atl. Coast Line R.R. Co.*, 200 U.S. 273, 283 (1906).

Privity also expanded the scope of injunctive relief against government defendants.[3] In opposing universal injunctions, Justice Thomas cited *Scott v. Donald*, 165 U.S. 107 (1897) for the proposition that injunctions against government defendants (there, South Carolina government defendants) may protect

---

[3] As described *infra* note 4, a notion of privity permitted nonparty preclusion against the federal government more than 80 years before this Court's decision in *Parklane Hosiery Co. v. Shore*, 439 U.S. 322 (1979).

only parties. *See Trump v. Hawaii*, 138 S. Ct. at 2428. But less than a decade after *Scott*, the Supreme Court heard another case filed against South Carolina government defendants, and there it embraced a contrary proposition. In *Gunter v. Atlantic Coast Line Railroad Co.*, the Atlantic Coast Line Railroad Company sued various state and municipal defendants, seeking an injunction against the collection of taxes. 200 U.S. at 281-82. The railroad relied on a previous injunction issued against the government defendants in a case brought by Thomas E. B. Pegues, the railroad's predecessor in interest. *Id.* The Court began its analysis by acknowledging an "undoubted" right:

> We at once treat as undoubted the right of the Atlantic Coast Line Railroad Company to the benefits of the decree in the Pegues Case, since it is conceded in the argument at bar that that company, as the successor to the rights of Pegues, is entitled to the protection of the original decree rendered in his favor.

*Id.* at 283. This acknowledgement was consistent with prevailing views of privity at the time. *See Wilson v. Alexander*, 276 F. 875, 880 (5th Cir. 1921) (characterizing Atlantic Coast and Pegues as in privity).

The Supreme Court's application of these "undoubted" rules of privity to extend injunctions beyond named parties further undermines any categorical argument about the historic scope of equitable relief.

## C. The History Of Nonmutual Preclusion Provides Additional Support For Universal Injunctions

Third, the law of preclusion further complicates critics' historical narrative. In *Parklane Hosiery Co. v. Shore*, 439 U.S. 322 (1979), the Supreme Court authorized offensive nonmutual issue preclusion, thereby permitting plaintiffs to invoke a prior equitable adjudication in a subsequent action even when they were not parties to the original suit. *Id.* at 331. Under *Parklane*, plaintiffs nationwide can thus be protected by prior judgments (including prior equitable judgments) issued in other cases. *Id.*; *see Baker ex rel. Thomas v. Gen. Motors Corp.*, 522 U.S. 222, 233 (1998) ("For claim and issue preclusion (res judicata) purposes, in other words, the judgment of the rendering State gains *nationwide* force.") (emphasis added).[4] The same considerations that led the *Parklane* Court to accept nonparty-protecting preclusion support nonparty-protecting injunctions. *See, e.g.*, *Nat'l Spiritual Assembly of Bahá'ís of U.S. Under Hereditary Guardianship, Inc.*

---

[4] Even before *Parklane*, nonparties could invoke preclusion if they were in privity with parties. *See supra*, Section I.B. Indeed, nonparty privies could even assert preclusion against the *federal government*. *See United States v. Des Moines Valley R.R. Co.*, 84 F. 40, 42-43 (8th Cir. 1897) (permitting nonparty preclusion against the federal government); *see also Chicago, Rock Island & Pac. R.R. Co. v. Schendel*, 270 U.S. 611, 619-20 (1926) (quoting *Des Moines Valley* approvingly); *Taylor v. Sturgell*, 553 U.S. 880, 899-900 (2008) (characterizing *Des Moines Valley* as applying the still-accepted principle that "[a] party may not use a representative or agent to relitigate an adverse judgment").

*v. Nat'l Spiritual Assembly of Bahá'ís of U.S., Inc.*, 628 F.3d 837, 848-57 (7th Cir. 2010) (connecting conceptions of privity in injunctions and preclusion).

The *Parklane* decision also demonstrates the Supreme Court's willingness to accept the sort of historical translation that would support universal injunctions in cases such as this one. The petitioners in *Parklane* argued that nonmutual preclusion violated the Seventh Amendment because the doctrine would not have been available in 1791. *See* 439 U.S. at 333. The Court rejected that argument, reasoning that there was an historical through line from the mutual preclusion available in 1791 to the nonmutual preclusion that developed later. *Id.* at 333-37. Similarly, there is an historical through line from traditional injunctions that protected parties to modern injunctions protecting nonparties. That through line is bolstered by the many historical examples of relief that did, in fact, protect nonparties.

In short, the history of equity does not support any categorical prohibition on federal courts issuing injunctions that protect nonparties.

## II. HISTORICAL RESEARCH FURTHER ESTABLISHES THAT FEDERAL AND ENGLISH COMMON-LAW COURTS ISSUED ORDERS PROTECTING NONPARTIES

Historical support for injunctions protecting nonparties also may be found outside of early equity. Recent research has revealed that English common law courts going back centuries issued writs protecting nonparties. Other research has

uncovered examples of U.S. federal courts issuing injunctions protecting nonparties. Although modern critics argue that nonparty injunctions depart from historical practice, a rule categorically barring such injunctions would represent the greater departure.

### A. Traditional English (And American) Courts Used Common Law Writs To Achieve The Functional Equivalent Of Universal Injunctions

Universal-injunction critics myopically focus on the courts of equity. In so doing, they fail to reckon with common law writs—which were historically used to protect nonparties in much the same way as universal injunctions.

Recent research by Professor James Pfander and Jacob Wentzel has drawn attention to the practice of the English court of King's Bench, the supreme court of common law. James E. Pfander & Jacob Wentzel, *The Common Law Origins of Ex parte Young*, 72 STAN. L. REV. __ (forthcoming 2020).[5] Pfander and Wentzel explain the role of King's Bench in regulating government conduct starting in the seventeenth century:

> Over time, King's Bench developed a series of writs . . . to correct the unlawful administration of government. These "administrative" writs . . . of *certiorari*, *mandamus*, and *prohibition*, which formed the pillars of common law's system of government oversight, enabled public-rights suitors to challenge the unlawful action of

---

[5] Available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3484165 (last visited Apr. 7, 2020).

> early administrative bodies such as commissions, boards, and justices of the peace. When these challenges were successful, they resulted in the issuance of specific relief, in the form of judgments to *quash* (certiorari), *command* (mandamus), or *prevent* (prohibition) official action in conformance with law. Notably, these judgments bore significant resemblance to injunctions in that they ordered official defendants to take or not to take specified action on pain of contempt. Importantly, too, the judgments were sometimes thought to disable an illicit course of government action as a general matter, thereby conferring benefits on similarly situated non-parties.

*Id.* at 6-7 (internal notes omitted).

In other words, traditional English courts had the power to "control unlawful government action as a general matter, with reference to those aggrieved and without regard to party status." *Id.* at 54. And Pfander and Wentzel's research shows that such practices found their way into early American courts as well. *Id.* at 54-57 (citing, *inter alia*, *Morewood v. Hollister*, 6 N.Y. 309 (1852); *State v. Justices of Middlesex County*, 1 N.J.L. 283 (1794); *Union Pacific Railroad Co. v. Hall*, 91 U.S. 343 (1875)).

Federal courts today are therefore on solid historical footing when issuing relief that protects nonparties against government action. To be sure, some historical articulations of this power were labeled "common law" rather than "equity." But that should be of no moment to a court system in which law and equity have merged, *see* Fed. R. Civ. P. 2, and in which "[t]he judicial Power . . . extend[s] to all Cases, in Law and Equity." U.S. Const. art. III, § 2.

**B.     Claims Regarding The Absence Of Injunctions Protecting Nonparties In U.S. Courts Are Overstated**

In addition, recent research undermines critics' claims about the historic absence in U.S. courts of injunctions protecting nonparties.  In fact, as a recent amicus brief by a group of legal historians explained, there are historical precedents to injunctions like the one issued in this case, and other doctrines (not any categorical prohibition) account for their relative sparsity in the 18th and 19th centuries.  *See* Brief of Amici Curiae Legal Historians, *supra,* at 8-22.

Professor Mila Sohoni's recently published research brings to light examples of injunctions protecting nonparties going back more than a century.  Mila Sohoni, *The Lost History of the "Universal" Injunction*, 133 HARV. L. REV. 920 (2020).  The Supreme Court itself issued a universal injunction in 1913:  it restrained enforcement of a federal statute affecting newspapers not just against the two plaintiff publications, but also against "other newspaper publishers."  *See id*. at 944-46.[6]  In addition, at least as far back as 1916, three-judge federal courts issued injunctions against the enforcement of state laws that protected nonparties.  *See id*. at 925.  For example, in *Pierce v. Society of Sisters*, 268 U.S. 510 (1925), the

---

[6] A copy of the Supreme Court's order in *Journal of Commerce & Commercial Bulletin v. Burleson*, 229 U.S. 600, 600 (1913) (per curiam) has been made available here: https://perma.cc/4KDR-J4HA.  The suit and its companion case were eventually decided under the caption *Lewis Publishing Co. v. Morgan*, 229 U.S. 288 (1913).

Supreme Court affirmed an injunction that completely barred the enforcement of the Oregon compulsory public-schooling law, even though the underlying lawsuits were brought by two schools suing for themselves alone. *See* Sohoni, *supra*, at 959-61. And in *West Virginia Board of Education v. Barnette*, 319 U.S. 624 (1943), the Supreme Court affirmed an injunction that reached beyond the plaintiff class of Jehovah's Witnesses and their children to *also* shield "any other children having religious scruples" from the state's compulsory flag-salute law. *See* Sohoni, *supra*, at 989-91 (quoting final decree).

These examples and others undermine claims that nonparty-protecting injunctions are new. They demonstrate that a prohibition on such injunctions—rather than the injunctions themselves—would be out of step with historical practice.

## III. PRECEDENT DOES NOT PROHIBIT FEDERAL COURTS FROM ISSUING INJUNCTIONS THAT PROTECT NONPARTIES

Some critics of universal injunctions also argue that injunctions protecting nonparties contradict the Supreme Court's decision in *United States v. Mendoza*, 464 U.S. 154 (1984). *See* Gov. Supp. Br. 46-47. That is incorrect. *Mendoza* held that the doctrine of offensive nonmutual issue preclusion could not be used against the federal government in that case. *Id.* at 162-64; *cf.* 18A Wright & Miller, Fed. Prac. & Proc. § 4465.4 (3d ed. 2019) (noting that *Mendoza* does not categorically prohibit nonmutual preclusion against the government). Critics argue that if a

nonparty does not get the preclusive benefit of a prior adjudication against the federal government, then that the same nonparty should not get the remedial benefit of an injunction against the federal government either. Yet that is the wrong lesson to draw from *Mendoza*.

That is because *Mendoza* was not grounded in history or Article III—it was a policy determination through and through. 464 U.S. at 159-63. *Mendoza* is thus best read as holding only that the appropriate scope of nonparty protection is a matter of policy. So, too, courts may exercise policy judgment when determining the scope of injunctive relief that is appropriate in a particular case. *See, e.g.*, Zachary D. Clopton, *National Injunctions and Preclusion*, 118 MICH. L. REV. 1 (2019); Alan M. Trammell, *Demystifying Nationwide Injunctions*, 98 TEX. L. REV. 67 (2019); Frost, *supra*, at 1065; Suzette M. Malveaux, Response, *Class Actions, Civil Rights, and the National Injunction*, 131 HARV. L. REV. F. 56 (2017).

Furthermore, *Mendoza*'s policy-specific concerns were tailored to nonmutual issue preclusion. They are poor fits for the universal-injunction context. Central to *Mendoza*'s holding was the Court's recognition that the federal government is subject to countless lawsuits across the country, many of which address issues that might determine numerous other cases. 464 U.S. at 159-61. Given that possibility, the *Mendoza* Court worried that the government would be

obliged to appeal *every* adverse ruling to avoid being locked into particular determinations. *Id.* at 160-61.

Whatever one makes of that concern in the issue-preclusion context, it has little bearing in the universal-injunction debate. Universal injunctions are contemplated only in a relatively small number of cases.[7] The few such injunctions that issue should not—and will not—take the government by surprise. And because this remedy is issued only in extraordinary circumstances, the government may quickly appeal adverse decisions and appellate courts can expeditiously hear those appeals.

The *Mendoza* Court also worried about inhibiting the percolation of issues through the federal courts. *Id.* at 160. But across contexts, the Supreme Court has made clear that an interest in percolation does not compel categorical rules. With respect to nationwide class actions, for example, the Supreme Court has explained:

> It often will be preferable to allow several courts to pass on a given class claim in order to gain the benefit of adjudication by different courts in different factual contexts. For this reason, a federal court when asked to certify a nationwide class should take care to ensure that nationwide relief is indeed appropriate in the case before it, and that certification of such a class would not

---

[7] Universal injunctions are, of course, limited by the usual test for the issuance of injunctive relief. *See, e.g.*, *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). The balancing of equities and the public interest (among other interests) may look different when the requested relief is "universal" rather than local.

> improperly interfere with the litigation of similar issues
> in other judicial districts. But we decline to adopt the
> extreme position that such a class may never be certified.

*Califano v. Yamasaki*, 442 U.S. 682, 702-03 (1979); *see also Parklane*, 439 U.S. at 331 (authorizing offensive nonmutual issue preclusion against private parties, which also would limit percolation). Importantly, universal injunctions do not bar the government from continuing to litigate in other courts, nor have they stopped many courts from hearing cases and reaching their own decisions on the merits. *See* Frost, *supra* at 1065 (collecting examples of such cases).

Regardless, universal-injunction cases such as this one are weak candidates for a percolation argument. These suits typically proceed quickly to appellate (if not Supreme Court) review, and they are often characterized by the participation of numerous intervenors and amici, which provide the functional equivalent of district-court percolation. And, just as *Califano* suggested in the class-action context (*see* 442 U.S. at 702-03), a court considering a universal injunction may take account of any need for percolation as part of its discretionary, fact-sensitive analysis. *See*, *e.g.*, *City of Chicago v. Sessions*, 888 F.3d 272, 290 (7th Cir. 2018), *vacated in part*, Nos. 17-2991, 18-2649, 2018 WL 4268817 (7th Cir. June 4, 2018) ("[C]ourts are capable of weighing the appropriate factors while remaining cognizant of the hazards of forum shopping and duplicative lawsuits.").

None of this is to say that policy arguments will tip in favor of universal injunctions in *all* cases. Far from it. *Mendoza* is a reminder that district courts should exercise their discretion with caution, and courts of appeals should review such exercises of this equitable power with great care. But *Mendoza* does not mean that district courts may never issue injunctions that protect nonparties.

## IV. ARTICLE III DOES NOT PRECLUDE FEDERAL COURTS FROM ISSUING INJUNCTIONS THAT PROTECT NONPARTIES

Finally, some critics of universal injunctions suggest that these remedies are inconsistent with Article III's standing requirements. Gov. Supp. Br. 44-45. This view of the federal judicial power is supported by neither case law nor logic. As the Supreme Court recently reiterated, "*at least one* plaintiff must have standing to seek each form of relief requested in the complaint." *Town of Chester v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1651 (2017) (emphasis added,alteration omitted). But not *all* parties that benefit from such relief must have standing to seek it.

Class actions illustrate this fundamental principle. District courts may provide class-wide relief even if some of the class members do not (and perhaps could not) establish standing. *See*, *e.g.*, *Langan v. Johnson & Johnson*, 897 F.3d 88, 93 (2d Cir. 2018) (rejecting Article III objection "as long as the named plaintiffs have standing to sue the named defendants"); *Morrison v. YTB Int'l, Inc.*, 649 F.3d 533, 536 (7th Cir. 2011) (same). In other words, courts may issue relief to many even if only one plaintiff has established standing.

Professor Amanda Frost has collected many other situations in which federal courts provide relief despite a lack of standing. *See* Frost, *supra*, at 1065 (discussing injunctions against future conduct, facial challenges to statutes, mootness exceptions, next friends, and associational standing, among others). As discussed above, privity and nonmutual preclusion also show that nonparties may invoke judgments whether or not they would have had standing in the original proceeding. *See supra*, Sections I.B and C; *B&B Hardware, Inc. v. Hargis Indus., Inc.*, 575 U.S. 138, 151 (2015) (dismissing Article III concerns with respect to issue preclusion); *see also Baker*, 522 U.S. at 233 ("A final judgment in one State, if rendered by a court with adjudicatory authority over the subject matter and persons governed by the judgment, qualifies for recognition throughout the land. For claim and issue preclusion (res judicata) purposes, in other words, the judgment of the rendering State gains *nationwide* force.") (emphasis added). And of course, federal courts are not prohibited from issuing judgments that affect nonparties, even when those nonparties would lack standing on their own. *See Califano*, 442 U.S. at 702 ("[T]he scope of injunctive relief is dictated by the extent of the violation established, not by the geographical extent of the plaintiff class."); *Hills v. Gautreaux*, 425 U.S. 284, 293-94 (1976) ("A federal court is required to tailor the scope of the remedy to fit the nature and extent of the constitutional violation.") (quotation marks and alteration omitted); Sohoni, *supra*,

at 931-32 (discussing *in rem* actions, admiralty, public nuisance, and injunctions against illegal acts, all of which benefit nonparties).

Accordingly, although the Government invokes Article III, the real issue is one of *remedy* rather than standing. As the Supreme Court has explained:

> The nature of the relief available after jurisdiction attaches is, of course, different from the question whether there is jurisdiction to adjudicate the controversy." *Avco Corp. v. Machinists*, 390 U.S. 557, 561 (1968). *See also Davis v. Passman*, 442 U.S. 228, 239-240, n. 18 (1979) ("*[J]urisdiction* is a question of whether a federal court has the power ... to hear a case"; "*relief* is a question of the various remedies a federal court may make available.").

*Plains Commerce Bank v. Long Family Land and Cattle Co.*, 554 U.S. 316, 351-52 (2008).

This distinction is more than just semantics. A decision relying on Article III not only constrains federal courts, but also undercuts the power of Congress. Congress cannot authorize federal courts to exercise jurisdiction that exceeds Article III. *See, e.g.*, *Verlinden B.V. v. Central Bank of Nigeria*, 461 U.S. 480, 491 (1983) ("Congress may not expand the jurisdiction of the federal courts beyond the bounds established by the Constitution.") Were this court to hold that Article III categorically prohibits injunctions that protect nonparties, Congress would be unable to authorize federal courts to issue any injunctions that protect nonparties—even in limited, enumerated circumstances. As noted above, such a

prohibition would be out of step with the historical practice stretching from traditional equity through more than a century of decisions from the Supreme Court and other federal courts.[8]

---

[8] Here, the district court also purported to vacate the rule only in Maryland, a remedy the Government never directly addresses in its brief. *See* Gov. Supp. Br. 43-50. As the City of Baltimore explains (pp. 51-52), setting aside a regulation is different from enjoining a defendant from applying that regulation. But to the extent that this Court, like the Government, sees fit to draw an analogy between injunction and vacatur, this brief's discussion of injunctive relief applies equally to vacatur: Nothing in Article III or elsewhere requires that vacatur be limited to the specific parties to the case. To the contrary, the APA authorizes the reviewing court to "hold unlawful and set aside" a rule universally. 5 U.S.C. § 706; *see, e.g.*, *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 131 (2000) (affirming the Fourth Circuit's invalidation of a FDA rule). Indeed, for the reasons discussed in the City of Baltimore's brief, courts have held that rules cannot be vacated in a party-specific fashion.

**CONCLUSION**

For the foregoing reasons, *amici* respectfully submit that history, precedent, and Article III of the Constitution do not compel this court to impose unjustified, categorical limits on the remedial authority of federal courts.

Dated:  April 28, 2020                    Respectfully submitted,

                                          s/ James R. Sigel
                                          JAMES R. SIGEL
                                          MORRISON & FOERSTER LLP
                                          425 Market Street
                                          San Francisco, CA 94105
                                          Telephone:  (415) 268-6948
                                          JSigel@mofo.com

                                          *Counsel for Amici*

# CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) and 32(a)(7)(B) because it contains 5,202 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Times New Roman font.

Dated: April 28, 2020          s/ James R. Sigel

                                               James R. Sigel

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Fourth Circuit by using the CM/ECF system on April 28, 2020.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Dated: April 28, 2020

_____/s/ James R. Sigel_____

James R. Sigel